# CARMELL *v.* TEXAS

No. 98–7540.   Argued November 30, 1999—Decided May 1, 2000

514

STEVENS, J., delivered the opinion of the Court, in which SCALIA, SOUTER, THOMAS, and BREYER, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and KENNEDY, JJ., joined, *post*, p. 553.

*Richard D. Bernstein*, by appointment of the Court, 527 U. S. 1051, argued the cause for petitioner. With him on the briefs were *Carter G. Phillips, Katherine L. Adams*, and *Paul A. Hemmersbaugh.*

*John Cornyn*, Attorney General of Texas, argued the cause for respondent. With him on the brief were *Andy Taylor*, First Assistant Attorney General, *Linda S. Eads*, Deputy Attorney General, *Gregory S. Coleman*, Solicitor General, and *Philip A. Lionberger*, Assistant Solicitor General.

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Waxman, Assistant Attorney*

*General Robinson, Deputy Solicitor General Dreeben,* and *Vicki S. Marani.**

JUSTICE STEVENS delivered the opinion of the Court.

An amendment to a Texas statute that went into effect on September 1, 1993, authorized conviction of certain sexual offenses on the victim's testimony alone. The previous statute required the victim's testimony plus other corroborating evidence to convict the offender. The question presented is whether that amendment may be applied in a trial for offenses committed before the amendment's effective date without violating the constitutional prohibition against state *"ex post facto"* laws.

I

In 1996, a Texas grand jury returned a 15-count indictment charging petitioner with various sexual offenses against his stepdaughter. The alleged conduct took place over more than four years, from February 1991 to March 1995, when the victim was 12 to 16 years old. The conduct ceased after the victim told her mother what had happened. Petitioner was convicted on all 15 counts. The two most serious counts charged him with aggravated sexual assault, and petitioner was sentenced to life imprisonment on those two counts.

---

*Robert P. Marcovitch* and *Barbara Bergman* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

A brief of *amici curiae* urging affirmance was filed for the State of Kansas et al. by *Carla J. Stovall,* Attorney General of Kansas, and *Stephen R. McAllister,* State Solicitor, joined by the Attorneys General for their respective States as follows: *Janet Napolitano* of Arizona, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Jeffrey A. Modisett* of Indiana, *Richard P. Ieyoub* of Louisiana, *Jennifer M. Granholm* of Michigan, *Joe Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Charles M. Condon* of South Carolina, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington.

For each of the other 13 offenses (5 counts of sexual assault and 8 counts of indecency with a child), petitioner received concurrent sentences of 20 years.

Until September 1, 1993, the following statute was in effect in Texas:

"A conviction under Chapter 21, Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred. The requirement that the victim inform another person of an alleged offense does not apply if the victim was younger than 14 years of age at the time of the alleged offense." Tex. Code Crim. Proc. Ann., Art. 38.07 (Vernon 1983).[1]

We emphasize three features of this law that are critical to petitioner's case.

The first is the so-called "outcry or corroboration" requirement. Under that provision, a victim's testimony can support a conviction for the specified offenses only if (1) that testimony is corroborated by other evidence, or (2) the victim informed another person of the offense within six months of its occurrence (an "outcry"). The second feature is the "child victim" provision, which is an exception to the outcry or corroboration requirement. According to this provision, if the victim was under 14 years old at the time of the alleged offense, the outcry or corroboration requirement does not apply and the victim's testimony alone can support a conviction—even without any corroborating evidence or outcry. The third feature is that Article 38.07 establishes a suffi-

---

[1] The chapter and sections to which this statute refers cover all the charges contained in the 15-count indictment against petitioner. Chapter 21 includes the offense of indecency with a child; § 22.011 covers sexual assault; § 22.021 criminalizes aggravated sexual assault.

ciency of the evidence rule respecting the minimum quantum of evidence necessary to sustain a conviction.   If the statute's requirements are not met (for example, by introducing only the uncorroborated testimony of a 15-year-old victim who did not make a timely outcry), a defendant cannot be convicted, and the court must enter a judgment of acquittal. See *Leday* v. *State*, 983 S. W. 2d 713, 725 (Tex. Crim. App. 1998); *Scoggan* v. *State*, 799 S. W. 2d 679, 683 (Tex. Crim. App. 1990).   Conversely, if the requirements are satisfied, a conviction, in the words of the statute, "is supportable," and the case may be submitted to the jury and a conviction sustained.   See *Vickery* v. *State*, 566 S. W. 2d 624, 626–627 (Tex. Crim. App. 1978); see also *Burnham* v. *State*, 821 S..W. 2d 1, 3 (Tex. Ct. App. 1991).[2]

Texas amended Article 38.07, effective September 1, 1993. The amendment extended the child victim exception to victims under 18 years old.[3]   For four of petitioner's counts,

---

[2] Texas courts treat Article 38.07 as a sufficiency of the evidence rule, rather than as a rule concerning the competency or admissibility of evidence.   Ordinarily, when evidence that should have been excluded is erroneously admitted against a defendant, the trial court's error is remedied on appeal by reversing the conviction and remanding for a new trial. See, *e. g.*, *Miles* v. *State*, 918 S. W. 2d 511, 512 (Tex. Crim. App. 1996); *Beltran* v. *State*, 728 S. W. 2d 382, 389 (Tex. Crim. App. 1987).   A trial court's failure to comply with the requirements of Article 38.07, by contrast, results not in a remand for a new trial, but in the reversal of conviction and remand for entry of an order of acquittal.   See, *e. g.*, *Scoggan*, 799 S. W. 2d, at 683.   At oral argument, Texas agreed that the foregoing is an accurate description of Texas law.   See Tr. of Oral Arg. 28–29, 32, 40–41.

[3] The new statute read in full:

"A conviction under Chapter 21, Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred.   The requirement that the victim inform another person of an alleged offense does not apply if the victim was younger than 18 years of age at the time of the alleged offense."   Tex. Code Crim. Proc. Ann., Art. 38.07, as amended by Act of May 29, 1993, 73d Leg., Reg.

that amendment was critical. The "outcry or corroboration" requirement was not satisfied for those convictions;[4] they rested solely on the victim's testimony. Accordingly, the verdicts on those four counts stand or fall depending on whether the child victim exception applies. Under the old law, the exception would *not* apply, because the victim was more than 14 years old at the time of the alleged offenses. Under the new law, the exception would apply, because the victim was under 18 years old at that time. In short, the validity of four of petitioner's convictions depends on whether the old or new law applies to his case, which, in turn, depends on whether the *Ex Post Facto* Clause prohibits the application of the new version of Article 38.07 to his case.

As mentioned, only 4 of petitioner's 15 total convictions are implicated by the amendment to Article 38.07; the other 11 counts—including the 2 convictions for which petitioner received life sentences—are uncontested. Six counts are uncontested because they were committed when the victim *was* under 14 years old, so his convictions stand even under the old law; the other five uncontested counts were committed after the new Texas law went into effect, so there could be no *ex post facto* claim as to those convictions. See

---

Sess., ch. 900, § 12.01, 1993 Tex. Gen. Laws 3765, 3766, and Act of May 10, 1993, 73d Leg., Reg. Sess., ch. 200, § 1, 1993 Tex. Gen. Laws 387, 388.

[4] The victim did not make an outcry until March 1995, more than six months after the alleged offenses. Although the 1993 amendment to Article 38.07 extended the outcry period from six months to one year, see n. 3, *supra*, the victim's outcry did not come within that time period either. Accordingly, that change in the outcry provision is immaterial to this case.

The State argues that there is evidence corroborating the victim's testimony, so it does not help petitioner even if the old law applies. See Brief for Respondent 4, n. 2. Before the state court, however, petitioner argued that "there was nothing to corroborate [the victim's] version of events," 963 S. W. 2d 833, 836 (Tex. Ct. App. 1998), and that court accepted the contention as correct for the purposes of its decision. We do the same here.

*Weaver* v. *Graham*, 450 U. S. 24, 31 (1981) ("The critical question [for an *ex post facto* violation] is whether the law changes the legal consequences of acts completed before its effective date"). What are at stake, then, are the four convictions on counts 7 through 10 for offenses committed between June 1992 and July 1993 when the victim was 14 or 15 years old and the new Texas law was not in effect.

Petitioner appealed his four convictions to the Court of Appeals for the Second District of Texas in Fort Worth. See 963 S. W. 2d 833 (1998). Petitioner argued that under the pre-1993 version of Article 38.07, which was the law in effect at the time of his alleged conduct, those convictions could not stand, because they were based *solely* on the victim's testimony, and the victim was not under 14 years old at the time of the offenses, nor had she made a timely outcry.

The Court of Appeals rejected petitioner's argument. Under the 1993 amendment to Article 38.07, the court observed, petitioner could be convicted on the victim's testimony alone because she was under 18 years old at the time of the offenses. The court held that applying this amendment retrospectively to petitioner's case did not violate the *Ex Post Facto* Clause:

> "The statute as amended does not increase the punishment nor change the elements of the offense that the State must prove. It merely 'removes existing restrictions upon the competency of certain classes of persons as witnesses' and is, thus, a rule of procedure. *Hopt v. Utah*, 110 U. S. 574, 590 . . . (1884)." *Id.*, at 836.

The Texas Court of Criminal Appeals denied discretionary review. Because the question whether the retrospective application of a statute repealing a corroboration requirement has given rise to conflicting decisions,[5] we granted peti-

---

[5] Compare *Utah* v. *Schreuder*, 726 P. 2d 1215 (Utah 1986) (finding *ex post facto* violation); *Virgin Islands* v. *Civil*, 591 F. 2d 255 (CA3 1979) (same), with *New York* v. *Hudy*, 73 N. Y. 2d 40, 535 N. E. 2d 250 (1988) (no *ex post*

tioner's *pro se* petition for certiorari, 527 U. S. 1002 (1999), and appointed counsel, *id.*, at 1051.

## II

To prohibit legislative Acts "contrary to the first principles of the social compact and to every principle of sound legislation,"[6] the Framers included provisions they considered to be "perhaps greater securities to liberty and republicanism than any [the Constitution] contains."[7] The provisions declare:

> "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ." U. S. Const., Art. I, § 10.[8]

The proscription against *ex post facto* laws "necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing." *Calder* v. *Bull*, 3 Dall. 386, 390 (1798) (Chase, J.). In *Calder* v. *Bull*, Justice Chase stated that the necessary explanation is derived from English common law well known to the Framers: "The expressions '*ex post facto laws*,' are *technical*, they had been in use long before the Revolution, and had acquired an appropriate meaning, by *Legislators*, *Lawyers*, and *Authors*." *Id.*, at 391; see also *id.*, at 389 ("The prohibition . . . very probably arose from the knowledge, that *the Parliament of Great Britain* claimed and exercised a power to pass *such laws* . . ."); *id.*, at 396 (Paterson, J.). Specifically, the

---

*facto* violation); *Murphy* v. *Sowders*, 801 F. 2d 205 (CA6 1986) (same); *Murphy* v. *Kentucky*, 652 S. W. 2d 69 (Ky. 1983) (same). See also *Idaho* v. *Byers*, 102 Idaho 159, 627 P. 2d 788 (1981) (judicial change in witness corroboration rule may not be applied retroactively); *Bowyer* v. *United States*, 422 A. 2d 973 (DC 1980) (same).

[6] The Federalist No. 44, p. 282 (C. Rossiter ed. 1961) (J. Madison).

[7] *Id.*, No. 84, at 511 (A. Hamilton).

[8] Article I, § 9, cl. 3, has a similar prohibition applicable to Congress: "No Bill of Attainder or ex post facto Law shall be passed."

phrase *"ex post facto"* referred only to certain types of crimi-
nal laws. Justice Chase cataloged those types as follows:

> "I will state *what laws* I consider *ex post facto laws*,
> within the *words* and the *intent* of the prohibition.
> 1st. Every law that makes an action done before the
> passing of the law, and which was *innocent* when done,
> criminal; and punishes such action. 2d. Every law
> that *aggravates* a *crime*, or makes it *greater* than it was,
> when committed. 3d. Every law that *changes the
> punishment*, and inflicts a *greater punishment*, than
> the law annexed to the crime, when committed. 4th.
> Every law that alters the *legal* rules of *evidence*, and
> receives less, or different, testimony, than the law re-
> quired at the time of the commission of the offence,
> *in order to convict the offender*." *Id.*, at 390 (emphasis
> in original).[9]

It is the fourth category that is at issue in petitioner's case.

The common-law understanding explained by Justice Chase
drew heavily upon the authoritative exposition of one of
the great scholars of the common law, Richard Wooddeson.
See *id.*, at 391 (noting reliance on Wooddeson's treatise).[10]

---

[9] Elsewhere in his opinion, Justice Chase described his taxonomy of
*ex post facto* laws as follows:

"Sometimes [*ex post facto* laws] respected the crime, by declaring acts
to be treason, which were not treason, when committed; at other times,
they violated the rules of evidence (to supply a deficiency of legal proof)
by admitting one witness, when the existing law required two; by re-
ceiving evidence without oath; or the oath of the wife against the hus-
band; or other testimony, which the courts of justice would not admit;
at other times they inflicted punishments, where the party was not, by
law, liable to any punishment; and in other cases, they inflicted greater
punishment, than the law annexed to the offence." 3 Dall., at 389 (em-
phasis deleted).

[10] Wooddeson was well known for his treatise on British common law,
A Systematical View of the Laws of England, which collected various
lectures he delivered as the Vinerian Professor and Fellow of Magdalen
College at Oxford. Though not as well known today, Justice Chase noted

Wooddeson's classification divided *ex post facto* laws into three general categories: those respecting the crimes themselves; those respecting the legal rules of evidence; and those affecting punishment (which he further subdivided into laws creating a punishment and those making an existing punishment more severe).[11]   See 2 R. Wooddeson, A Systematical View of the Laws of England 625–640 (1792) (Lecture 41) (hereinafter Wooddeson).   Those three categories (the last of which was further subdivided) correlate precisely to *Calder*'s four categories.   Justice Chase also used language in describing the categories that corresponds directly to Wooddeson's phrasing.[12]   Finally, in four

that Wooddeson was William Blackstone's successor, 3 Dall., at 391 (Blackstone held the Vinerian chair at Oxford until 1766), and his treatise was repeatedly cited in the years following the ratification by lawyers appearing before this Court and by the Court itself.   See, *e. g., Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. 518, 562–563 (1819) (argument of Daniel Webster); *id.,* at 668, 676 (Story, J.); *Town of Pawlet* v. *Clark,* 9 Cranch 292, 326, 329 (1815) (Story, J.); *The Nereide,* 9 Cranch 388, 449 (1815) (Story, J.); *Cooper* v. *Telfair,* 4 Dall. 14, 16–17 (1800) (arguments of Edward Tilghman, Jared Ingersoll, and Alexander Dallas); *Hannum* v. *Spear,* 2 Dall. 291 (Err. App. Pa. 1795); *Glass* v. *Sloop Betsey,* 3 Dall. 6, 8 (1794).

[11] Specifically, in the former category Wooddeson included those laws that make "some innovation, or creat[e] some forfeiture or disability, not incurred in the ordinary course of law."   2 R. Wooddeson, A Systematical View of the Laws of England 638 (1792).   In the latter category, he placed those laws that "imposed a sentence *more severe* than could have been awarded by the inferior courts."   *Id.,* at 639.   As examples of the former category Wooddeson cited the bills passed by Parliament that banished Lord Clarendon in 1669 and Bishop Atterbury in 1723.   Those punishments were considered "innovation[s] . . . not incurred in the ordinary course of law" because banishment, at those times, was simply not a form of penalty that could be imposed by the courts.   *Ibid.*   See 11 W. Holdsworth, A History of English Law 569 (1938); Craies, The Compulsion of Subjects to Leave the Realm, 6 L. Q. Rev. 388, 396 (1890).

[12] See 2 Wooddeson 631 (referring to laws that "respec[t] the crime, determining those things to be treason, which by no prior law or adjudication could be or had been so declared"); *id.,* at 633–634 (referring to laws "respecting . . . the rules of *evidence* [rectifying] a deficiency of

footnotes in Justice Chase's opinion, he listed examples of various Acts of Parliament illustrating each of the four categories. See 3 Dall., at 389, nn. *, †, ‡, ||.[13] Each of these examples is exactly the same as the ones Wooddeson himself used in his treatise. See 2 Wooddeson 629 (case of the Earl of Strafford); *id.*, at 634 (case of Sir John Fenwick); *id.*, at 638 (banishments of Lord Clarendon and of Bishop Atterbury); *id.*, at 639 (Coventry Act).

*Calder*'s four categories, which embraced Wooddeson's formulation, were, in turn, soon embraced by contemporary scholars. Joseph Story, for example, in writing on the *Ex Post Facto* Clause, stated:

> "The general interpretation has been, and is, . . . that the prohibition reaches every law, whereby an act is declared a crime, and made punishable as such, when it was not a crime, when done; or whereby the act, if a crime, is aggravated in enormity, or punishment; or whereby different, or less evidence, is required to convict an offender, than was required, when the act was committed." 3 Commentaries on the Constitution of the United States § 1339, p. 212 (1833).

James Kent concurred in this understanding of the Clause:

> "[T]he words *ex post facto laws* were technical expressions, and meant every law that made an act done before the passing of the law, and which was innocent when done, criminal; or which aggravated a crime, and

---

legal proof" created when only one witness was available but "a statute then lately made requiring two witnesses" had been in effect); *id.*, at 638 (describing "acts of parliament, which principally affect *the punishment,* making therein some innovation, or creating some forfeiture or disability, not incurred in the ordinary course of law"); *id.*, at 639 (referring to instances where "the legislature . . . imposed a sentence *more severe* than could have been awarded by the inferior courts"). Cf. n. 9, *supra.*

[13] The instances cited were the case of the Earl of Strafford, the case of Sir John Fenwick, the banishments of Lord Clarendon and of Bishop Atterbury, and the Coventry Act.

made it greater than it was when committed; or which changed the punishment, and inflicted a greater punishment than the law annexed to the crime when committed; or which altered the legal rules of evidence, and received less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender." 1 Commentaries on American Law 408 (3d ed. 1836) (Lecture 19).

This Court, moreover, has repeatedly endorsed this understanding, including, in particular, the fourth category (sometimes quoting Chase's words verbatim, sometimes simply paraphrasing). See *Lynce* v. *Mathis*, 519 U. S. 433, 441, n. 13 (1997); *Dobbert* v. *Florida*, 432 U. S. 282, 293 (1977); *Malloy* v. *South Carolina*, 237 U. S. 180, 183–184 (1915); *Mallett* v. *North Carolina*, 181 U. S. 589, 593–594 (1901); *Thompson* v. *Missouri*, 171 U. S. 380, 382, 387 (1898); *Hawker* v. *New York*, 170 U. S. 189, 201 (1898) (Harlan, J., dissenting); *Gibson* v. *Mississippi*, 162 U. S. 565, 589–590 (1896); *Duncan* v. *Missouri*, 152 U. S. 377, 382 (1894); *Hopt* v. *Territory of Utah*, 110 U. S. 574, 589 (1884); *Kring* v. *Missouri*, 107 U. S. 221, 228 (1883), overruled on other grounds, *Collins* v. *Youngblood*, 497 U. S. 37 (1990); *Gut* v. *State*, 9 Wall. 35, 38 (1870); *Ex parte Garland*, 4 Wall. 333, 390–391 (1867) (Miller, J., dissenting); *Cummings* v. *Missouri*, 4 Wall. 277, 325–326, 328 (1867). State courts, too, in the years following *Calder*, adopted Justice Chase's four-category formulation. See *Boston & Gunby* v. *Cummins*, 16 Ga. 102, 106 (1854); *Martindale* v. *Moore*, 3 Blackf. 275, 277 (Ind. 1833); *Davis* v. *Ballard*, 24 Ky. 563, 578 (1829); *Strong* v. *State*, 1 Blackf. 193, 196 (Ind. 1822); *Dickinson* v. *Dickinson*, 7 N. C. 327, 330 (1819); see also *Woart* v. *Winnick*, 3 N. H. 473, 475 (Super. Ct. 1826).[14]

---

[14] The reception given the four categories contrasts with that given to *Calder*'s actual holding—that the *Ex Post Facto* Clause applies only to criminal laws, not to civil laws. The early criticism levied against that holding, see, *e. g.*, *Satterlee* v. *Matthewson*, 2 Pet. 380, 416, 681–687 (App. I)

## III

As mentioned earlier, Justice Chase and Wooddeson both cited several examples of *ex post facto* laws, and, in particular, cited the case of Sir John Fenwick as an example of the fourth category. To better understand the type of law that falls within that category, then, we turn to Fenwick's case for preliminary guidance.

Those who remained loyal to James II after he was deposed by King William III in the Revolution of 1688 thought their opportunity for restoration had arrived in 1695, following the death of Queen Mary. 9 T. Macaulay, History of England 31 (1899) (hereinafter Macaulay). Sir John Fenwick, along with other Jacobite plotters including George Porter and Cardell Goodman, began concocting their scheme in the spring of that year, and over the next several months the original circle of conspirators expanded in number. *Id.*, at 32, 47–48, 109–110. Before the conspirators could carry out their machinations, however, three members of the group disclosed the plot to William. *Id.*, at 122–125. One by one, the participants were arrested, tried, and convicted of treason. *Id.*, at 127–142. Fenwick, though, remained in hiding while the rest of the cabal was brought to justice. During that time, the trials of his accomplices revealed that there were only two witnesses among them who could prove Fenwick's guilt, Porter and Goodman. *Id.*, at 170–171. As luck would have it, an act of Parliament proclaimed that two witnesses were necessary to convict a person of high treason. See An Act for Regulateing of Tryals in

---

(1829) (Johnson, J., concurring); *Stoddart* v. *Smith*, 5 Binn. 355, 370 (Pa. 1812) (Brackenridge, J.), was absent with respect to the four categories. Although Justice Chase's opinion may have somewhat dampened the appetite for further debate in the courts, that consideration would not necessarily have an effect on scholarly discourse, nor does it explain why judges would be reluctant to express criticism of the four categories, yet harbor no compunction when it came to criticizing the actual holding of the Court.

Cases of Treason and Misprision of Treason, 7 & 8 Will. III, ch. 3, § 2 (1695–1696), in 7 Statutes of the Realm 6 (reprint 1963).[15]  Thus, Fenwick knew that if he could induce either Porter or Goodman to abscond, the case against him would vanish.  9 Macaulay 171.

Fenwick first tried his hand with Porter.  Fenwick sent his agent to attempt a bribe, which Porter initially accepted in exchange for leaving for France.  But then Porter simply pocketed the bribe, turned in Fenwick's agent (who was promptly tried, convicted, and pilloried), and proceeded to testify against Fenwick (along with Goodman) before a grand jury.  Id., at 171–173.  When the grand jury returned an indictment for high treason, Fenwick attempted to flee the country himself, but was apprehended and brought before the Lord Justices in London.  Sensing an impending conviction, Fenwick threw himself on the mercy of the court and offered to disclose all he knew of the Jacobite plotting, aware all the while that the judges would soon leave the city for their circuits, and a delay would thus buy him a few weeks time.  Id., at 173–174.

Fenwick was granted time to write up his confession, but rather than betray true Jacobites, he concocted a confession calculated to accuse those loyal to William, hoping to introduce embarrassment and perhaps a measure of instability to the current regime.  Id., at 175–178.  William, however, at once perceived Fenwick's design and rejected the confession, along with any expectation of mercy.  Id., at 178–

---

[15] That Act read, in relevant part:

"And bee it further enacted That . . . noe Person or Persons whatsoever shall bee indicted tryed or attainted of High Treason . . . but by and upon the Oaths and Testimony of Two lawfull Witnesses either both of them to the same Overtact or one of them to one and another of them to another Overtact of the same Treason unlesse the Party indicted and arraigned or tryed shall willingly without violence in open Court confesse the same or shall stand Mute or refuse to plead or in cases of High Treason shall peremptorily challenge above the Number of Thirty five of the Jury . . . ."

180, 194. Though his contrived ploy for leniency was unsuccessful in that respect, it proved successful in another: during the delay, Fenwick's wife had succeeded in bribing Goodman, the other witness against him, to leave the country. *Id.*, at 194–195.[16]

Without a second witness, Fenwick could not be convicted of high treason under the statute mentioned earlier. For all his plotting, however, Fenwick was not to escape. After Goodman's absence was discovered, the House of Commons met and introduced a bill of attainder against Fenwick to correct the situation produced by the combination of bribery and the two-witness law. *Id.*, at 198–199. A lengthy debate ensued, during which the Members repeatedly discussed whether the two-witness rule should apply.[17] Ultimately, the bill passed by a close vote of 189 to 156, *id.*, at 210, notwithstanding the objections of Members who (foreshadowing *Calder*'s fourth category) complained that Fenwick was being attainted "upon less Evidence" than

---

[16] This time, Fenwick's wife handled the bribe with a deftness lacking in the first attempt. Not only was Goodman (popularly called "Scum Goodman," see 9 Macaulay 32) an easier target, but Lady Fenwick's agent gave Goodman an offer he couldn't refuse: abscond and be rewarded, or have his throat cut on the spot. *Id.*, at 195. Goodman's instinct for self-preservation prevailed, and the agent never parted company with him until they both safely reached France. *Ibid.*

[17] See, *e. g.*, The Proceedings Against Sir John Fenwick Upon a Bill of Attainder for High Treason 40 (1702) (hereinafter Proceedings) (" 'Tis Extraordinary that you bring Sir *John Fenwick*, here to Answer for Treason, when . . . you have but one Witness to that Treason . . . . Treason be not Treason unless it be proved by two Witnesses . . ."); *id.*, at 103 ("It hath been objected, That there ought to be two Witnesses, by the late Statute"); *id.*, at 227 ("I do take it to be part of the Law of the Land, That no Man should be condemned for Treason without two Witnesses"); *id.*, at 256–257 ("[I]f we sit here to Judge, we sit to Judge him according to the Law of *England* . . . . Will you set up a Judgment . . . upon one Witness, when the Law says you shall have two; and after all, say 'tis a reasonable Proceeding?").

would be required under the two-witness law,[18] and despite the repeated importuning against the passing of an *ex post facto* law.[19]   The bill then was taken up and passed by the

[18] See, *e. g., id.,* at 270 ("I believe this House can't take away any Persons Life upon less Evidence than Inferiour Courts could do"); *id.,* at 288 ("Shall we that are the Supream Authority . . . go upon less Evidence to satisfie ourselves of Sir *John Fenwick*'s Guilt, than other Courts?"); *id.,* at 317 ("I can't satisfie my self in my Conscience, and should think some misfortune might follow me and my Posterity, if I passed Sentence upon Sir *John Fenwick*'s Life, upon less Evidence than the Law of *England* requires"); *id.,* at 342 ("But the Liberty of the People of *England* is very much concerned in the Revocation of that Act; and none of the Arguments that have been used can Convince me, That I ought to give Judgment upon less Evidence than is required by that Act").

[19] See, *e. g., id.,* at 145 ("I can't say, but those Persons, who in the last Sessions of Parliament, were Imprisoned by an Act *Ex Post Facto*, and subsequent to the Fact Complained of, yet when it was passed into a Law, they were Legally Detained: but, I hope, I may take notice of their Case, as some kind of Reason against this, to the end that those Laws may not grow familiar, that they may not easily be obtained; because Precedents generally grow, and as that Law *Ex Post Facto*, extended to Liberty, so this extends to Life . . ."); *id.,* at 152–153 ("It would be too much at once to make a *subsequent Law* to condemn a Man to Death . . . . I am afraid none are safe if that be admitted, That a *subsequent Law* may take away a Man's Life . . ." (emphasis added)); *id.,* at 197 ("Sir, It hath been urged to you, of what ill Consequence it would be, and how much Injustice to make a Law to Punish a Man, *Ex post Facto* . . ."); *id.,* at 256 ("But how shall they Judge?   By the Laws in being. . . . That you may Judge that to be Treason in this House, *that was not so by the Law before.* So that give me leave to say, therefore there is no such Power reserved to the Parliament, to Declare any thing Treason that is not Treason before" (emphasis added)); *id.,* at 282–283 ("[F]or according to your Law, no Man shall be declared Guilty of Treason, unless there be two Witnesses against him . . . .   But how can a Man satisfie his own Conscience, to Condemn any Man by *a Law that is subsequent to the Fact?*   For that is the Case . . ." (emphasis added)); *id.,* at 305 ("I think I may confidently affirm, there is not so much as one Precedent where a Person . . . was taken away from his Tryal, . . . . and cut off extrajudicially by an Act made on purpose, *Ex post Facto*"); *id.,* at 331–332 ("Those Acts that have been made since, are made certainly to provide, That in no Case whatsoever, a Man should be so much as accused without two Witnesses

House of Lords, and the King gave his assent. *Id.*, at 214–225; see also An Act to Attaint Sir John Fenwick Baronet of High Treason, 8 Will. III, ch. 4 (1696). On January 28, 1697, Sir John Fenwick was beheaded. 9 Macaulay 226–227.

## IV

Article 38.07 is unquestionably a law "that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Under the law in effect at the time the acts were committed, the prosecution's case was legally insufficient and petitioner was entitled to a judgment of acquittal, unless the State could produce both the victim's testimony *and* corroborative evidence. The amended law, however, changed the quantum of evidence necessary to sustain a conviction; under the new law, petitioner could be (and was) convicted on the victim's testimony alone, without any corroborating evidence. Under any commonsense understanding of *Calder*'s fourth category, Article 38.07 plainly fits. Requiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely "less testimony required to convict" in any straightforward sense of those words.

Indeed, the circumstances of petitioner's case parallel those of Fenwick's case 300 years earlier. Just as the relevant law in Fenwick's case required more than one witness' testimony to support a conviction (namely, the testimony of a second witness), Texas' old version of Article 38.07 required more than the victim's testimony alone to sustain a conviction (namely, other corroborating evidence).[20] And just like Fen-

of the Treason. . . . Then this is a Law; *ex post facto*, and that hath been always condemned . . .").

[20] Texas argues that the corroborative evidence required by Article 38.07 "need not be more or different from the victim's testimony; it may be entirely cumulative of the victim's testimony." Brief for Respondent 19;

wick's bill of attainder, which permitted the House of Commons to convict him with less evidence than was otherwise required, Texas' retrospective application of the amendment to Article 38.07 permitted petitioner to be convicted with less than the previously required quantum of evidence. It is true, of course, as the Texas Court of Appeals observed, that "[t]he statute as amended does not increase the punishment nor change the elements of the offense that the State must prove." 963 S. W. 2d, at 836. But that observation simply demonstrates that the amendment does not fit within *Calder*'s first and third categories. Likewise, the dissent's remark that "Article 38.07 does not establish an element of the offense," *post*, at 559, only reveals that the law does not come within *Calder*'s first category. The fact that the amendment authorizes a conviction on less evidence than previously required, however, brings it squarely within the fourth category.

## V

The fourth category, so understood, resonates harmoniously with one of the principal interests that the *Ex Post Facto* Clause was designed to serve, fundamental justice.[21]

---

see also *post*, at 561, n. 6 (dissenting opinion). The trouble with that argument is that the same was true in Fenwick's case. The relevant statute there required the "Testimony of Two lawfull Witnesses *either both of them to the same Overtact* or one of them to one and another of them to another Overtact of the same Treason." See n. 15, *supra* (emphasis added).

[21] The Clause is, of course, also aimed at other concerns, "namely, that legislative enactments give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed," *Miller* v. *Florida,* 482 U. S. 423, 430 (1987) (internal quotation marks omitted), and at reinforcing the separation of powers, see *Weaver* v. *Graham,* 450 U. S. 24, 29, n. 10 (1981). But those are not its only aims, and the absence of a reliance interest is not an argument in favor of abandoning the category itself. If it were, the same conclusion would follow for *Calder*'s third category (increases in punishment), as there are few, if any, reliance interests in planning future criminal activities based on the expectation of less severe repercussions.

Justice Chase viewed all *ex post facto* laws as "manifestly *unjust and oppressive.*" *Calder*, 3 Dall., at 391. Likewise, Blackstone condemned them as "cruel and unjust," 1 Commentaries on the Laws of England 46 (1765), as did every state constitution with a similar clause, see n. 25, *infra.* As Justice Washington explained in characterizing "[t]he injustice and tyranny" of *ex post facto* laws:

> "Why did the authors of the constitution turn their attention to this subject, which, at the first blush, would appear to be peculiarly fit to be left to the discretion of those who have the police and good government of the State under their management and control? The only answer to be given is, because laws of this character are oppressive, unjust, and tyrannical; and, as such, are condemned by the universal sentence of civilized man." *Ogden* v. *Saunders*, 12 Wheat. 213, 266 (1827).

In short, the *Ex Post Facto* Clause was designed as "an *additional* bulwark in favour of the personal security of the subject," *Calder*, 3 Dall., at 390 (Chase, J.), to protect against "the favorite and most formidable instruments of tyranny," The Federalist No. 84, p. 512 (C. Rossiter ed. 1961) (A. Hamilton), that were "often used to effect the most detestable purposes," *Calder*, 3 Dall., at 396 (Paterson, J.).

*Calder*'s fourth category addresses this concern precisely. A law reducing the quantum of evidence required to convict an offender is as grossly unfair as, say, retrospectively eliminating an element of the offense, increasing the punishment for an existing offense, or lowering the burden of proof (see *infra*, at 540–544). In each of these instances, the government subverts the presumption of innocence by reducing the number of elements it must prove to overcome that presumption; by threatening such severe punishment so as to induce a plea to a lesser offense or a lower sentence; or by making it easier to meet the threshold for overcoming the presumption. Reducing the quantum of evidence necessary

to meet the burden of proof is simply another way of achieving the same end.[22] All of these legislative changes, in a sense, are mirror images of one another. In each instance, the government refuses, after the fact, to play by its own rules, altering them in a way that is advantageous only to the State, to facilitate an easier conviction. There is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.[23]

Indeed, Fenwick's case is itself an illustration of this principle. Fenwick could claim no credible reliance interest in the two-witness statute, as he could not possibly have known that only two of his fellow conspirators would be able to testify as to his guilt, nor that he would be successful in bribing one of them to leave the country. Nevertheless, Parliament had enacted the two-witness law, and there was

---

[22] Lowering the burden of persuasion, to be sure, is not precisely the same thing as lowering (as a matter of law) the amount of evidence necessary to meet that burden. But it does not follow, as the dissent appears to think, that only the former subverts the presumption of innocence. *Post*, at 560–561 (opinion of GINSBURG, J.).

[23] We do not mean to say that every rule that has an effect on whether a defendant can be convicted implicates the *Ex Post Facto* Clause. Ordinary rules of evidence, for example, do not violate the Clause. See *infra*, at 543–547. Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as "unfair" or "unjust," they do not implicate the same *kind* of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard. Moreover, while the principle of unfairness helps explain and shape the Clause's scope, it is not a doctrine unto itself, invalidating laws under the *Ex Post Facto* Clause by its own force. Cf. *W. S. Kirkpatrick & Co.* v. *Environmental Tectonics Corp., Int'l*, 493 U. S. 400, 409 (1990).

a profound unfairness in Parliament's retrospectively altering the very rules it had established, simply because those rules prevented the conviction of the traitor—notwithstanding the fact that Fenwick could not truly claim to be "innocent." (At least one historian has concluded that his guilt was clearly established, see 9 Macaulay 203–204, and the debate in the House of Commons bears out that conclusion, see, e. g., Proceedings 219, 230, 246, 265, 289.) Moreover, the pertinent rule altered in Fenwick's case went directly to the general issue of guilt, lowering the minimum quantum of evidence required to obtain a conviction. The Framers, quite clearly, viewed such maneuvers as grossly unfair, and adopted the *Ex Post Facto* Clause accordingly.[24]

## VI

The United States as *amicus* asks us to revisit the accuracy of the fourth category as an original matter. None of its reasons for abandoning the category is persuasive.

---

[24] Fenwick's case also illustrates how such *ex post facto* laws can operate similarly to retrospective increases in punishment by adding to the coercive pressure to accept a plea bargain. When Fenwick was first brought before the Lord Justices, he was given an opportunity to make a confession to the King. Though he squandered the opportunity by authoring a plain contrivance, Fenwick could have reasonably assumed that a sincere confession would have been rewarded with leniency—the functional equivalent of a plea bargain. See 9 Macaulay 125. When the bill of attainder was taken up by the House of Commons, there is evidence that this was done to pressure Fenwick into making the honest confession he had failed to make before. See, e. g., Proceedings 197 (" 'Tis a Matter of Blood, 'tis true, but I do not aim at this Gentleman's Life in it . . . all I Propose by it, is to get his Confession"); id., at 235 ("[W]e do not aim at Sir *John Fenwick*'s Blood, (God forbid we should) but at his Confession"); id., at 255 ("Why, give me leave to say to you, 'tis a new way not known in *England,* that you will Hang a Man unless he will Confess or give Evidence . . ."). And before the House of Lords, Fenwick was explicitly threatened that unless he confessed, they would proceed to consider the bill against him. 9 Macaulay 218.

First, pointing to Blackstone's Commentaries and a handful of state constitutions cited by Justice Chase in *Calder*, see 3 Dall., at 391–392, the United States asserts that Justice Chase simply got it wrong with his four categories. Blackstone wrote: "There is still a more unreasonable method than this, which is called making of laws *ex post facto;* when *after* an action is committed, the legislator then for the first time declares it to have been a crime, and inflicts a punishment upon the person who has committed it . . . ." 1 Commentaries on the Laws of England, at 46 (emphasis in original). The *ex post facto* clauses in Ratification-era state constitutions to which Justice Chase cited are of a piece.[25] The United States directs our attention to the fact that none of these definitions mentions Justice Chase's fourth category.

All of these sources, though, are perfectly consistent with Justice Chase's first category of *ex post facto* laws. None of them is incompatible with his four-category formulation, unless we accept the premise that Blackstone and the state constitutions purported to express the *exclusive* definition of an *ex post facto* law. Yet none appears to do so on its face. And if those definitions were read as exclusive, the United

---

[25] Massachusetts' clause read as follows: "Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government." Constitution of Massachusetts, Pt. I, Art. 24 (1780), in 5 W. Swindler, Sources and Documents of United States Constitutions 95 (1975) (hereinafter Swindler). The Constitutions of Maryland and North Carolina used identical words: "That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no *ex post facto* law ought to be made." Maryland Constitution, A Declaration of Rights, Art. 15 (1776), in 4 Swindler 373; North Carolina Constitution, A Declaration of Rights, Art. 24 (1776), in 7 Swindler 403. And Delaware's Declaration of Rights and Fundamental Rules, Art. 11 (1776), in 2 Swindler 198, stated, "That retrospective Laws, punishing Offenses committed before the Existence of such Laws, are oppressive and unjust and ought not to be made."

States' argument would run up against a more troubling obstacle, namely, that neither Blackstone nor the state constitutions mention *Calder*'s third category either (increases in punishment). The United States, in effect, asks us to abandon two of *Calder*'s categories based on the unsupported supposition that the Blackstonian and state constitutional definitions were exclusive, and upon the implicit premise that neither Wooddeson, Chase, Story, Kent, nor subsequent courts (state and federal) realized that was so. We think that simply stating the nature of the request demonstrates why it must be rejected.[26]

Next, the United States contends Justice Chase was mistaken to cite the case of Sir John Fenwick as an example of an *ex post facto* law, because it was actually a bill of attainder. Fenwick was indeed convicted by a bill of attainder, but it does not follow that his case cannot also be an example of an *ex post facto* law. Clearly, Wooddeson thought it was, see 2 Wooddeson 641, as did the House of Commons, see n. 19, *supra*, and we are aware of no rule stating that a single historical event can explain one, but not two, constitutional Clauses (actually, three Clauses, see Art. III, § 3 (Treason Clause)). We think the United States' observation simply underscores the kinship between bills of attainder and *ex post facto* laws, see *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 468, n. 30 (1977); *United States* v. *Lovett*, 328 U. S. 303, 323 (1946) (Frankfurter, J., concurring); see also Z. Chafee, Three Human Rights in the Constitution of 1787, pp. 92–93 (1956) (herein-

---

[26] Nor does it help much to cite Justice Iredell's statement that *ex post facto* laws include those that "inflict a punishment for any act, which was innocent at the time it was committed; [or] increase the degree of punishment previously denounced for any specific offence," *Calder* v. *Bull*, 3 Dall. 386, 400 (1798). The argument still requires us to believe that Justice Iredell—and only Justice Iredell—got it right, and that all other authorities (now including Blackstone and the state constitutions) somehow missed the point.

after Chafee), which may explain why the Framers twice placed their respective prohibitions adjacent to one another. And if the United States means to argue that category four should be abandoned because its illustrative example was a bill of attainder, this would prove entirely too much, because *all* of the specific examples listed by Justice Chase were passed as bills of attainder.[27]

Finally, both Texas and the United States argue that we have already effectively cast out the fourth category in *Collins* v. *Youngblood*, 497 U. S. 37 (1990). *Collins* held no such thing. That case began its discussion of the *Ex Post Facto* Clause by quoting verbatim Justice Chase's "now familiar opinion in *Calder*" and his four-category definition. *Id.*, at 41–42. After noting that "[e]arly opinions of the Court portrayed this as an exclusive definition of *ex post facto* laws," *id.*, at 42, the Court then quoted from our opinion in *Beazell* v. *Ohio*, 269 U. S. 167 (1925):

> " 'It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post*

---

[27] See An Act for the Attainder of Thomas Earle of Strafford of High Treason, 16 Car. I, ch. 38 (1640), in 5 Statutes of the Realm 177 (reprint 1963); An Act for Banishing and Disenabling the Earl of Clarendon, 19 & 20 Car. II, ch. 2 (1667–1668), in 5 Statutes of the Realm, at 628; An Act to Inflict Pains and Penalties on Francis (Atterbury) Lord Bishop of Rochester, 9 Geo. I, ch. 17 (1722); An Act to Prevent Malicious Maiming and Wounding (Coventry Act), 22 & 23 Car. II, ch. 1 (1670). While the bills against the Earl of Clarendon and Bishop Atterbury appear to be bills of pains and penalties, see Chafee 117, 136, as does the Coventry Act, see 2 Wooddeson 638–639, those are simply a subspecies of bills of attainder, the only difference being that the punishment was something less than death. See *Drehman* v. *Stifle*, 8 Wall. 595, 601 (1870).

*facto.'"*   *Collins,* 497 U. S., at 42 (quoting *Beazell,* 269 U. S., at 169–170).

*Collins* then observed in a footnote: "The *Beazell* definition omits the reference by Justice Chase in *Calder* v. *Bull,* to alterations in the 'legal rules of evidence.' As cases subsequent to *Calder* make clear, this language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes." 497 U. S., at 43, n. 3 (citations omitted). *Collins* then commented that "[t]he *Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause." *Id.,* at 43.

It seems most accurate to say that *Collins* is rather cryptic. While calling *Calder*'s four categories the "exclusive definition" of *ex post facto* laws, it also calls *Beazell*'s definition a "faithful" rendition of the "original understanding" of the Clause, even though that quotation omitted category four. And while *Collins* quotes a portion of *Beazell* omitting the fourth category, the immediately preceding paragraph in *Beazell* explains that the law at issue in that case did not change "[t]he quantum and kind of proof required to establish guilt," 269 U. S., at 170, a statement distinguishing, rather than overruling, *Calder*'s fourth category.

If *Collins* had intended to resurrect a long forgotten original understanding of the *Ex Post Facto* Clause shorn of the fourth category, we think it strange that it would have done so in a footnote. Stranger still would be its reliance on a single case from 1925, which did not even implicate, let alone purport to overrule, the fourth category, and which did not even mention Fenwick's case. But this Court does not discard longstanding precedent in this manner. Further still, *Collins* itself expressly overruled two of our prior cases; if the Court that day were intent on overruling part of *Calder* as well, it surely would have said so directly, rather than act in such an ambiguous manner.

The better understanding of *Collins'* discussion of the *Ex Post Facto* Clause is that it eliminated a doctrinal hitch that had developed in our cases, which purported to define the scope of the Clause along an axis distinguishing between laws involving "substantial protections" and those that are merely "procedural." Both *Kring* v. *Missouri*, 107 U. S. 221 (1883), and *Thompson* v. *Utah*, 170 U. S. 343 (1898)—the two cases *Collins* overruled—relied on just that distinction. In overruling them, the Court correctly pointed out, "the prohibition which may not be evaded is the one defined by the *Calder* categories." 497 U. S., at 46. Accordingly, *Collins* held that it was a mistake to stray *beyond Calder*'s four categories, not that the fourth category was itself mistaken.[28]

## VII

Texas next argues that even if the fourth category exists, it is limited to laws that retrospectively alter the burden of proof (which Article 38.07 does not do). See also *post*, at 572 (dissenting opinion). It comes to this conclusion on the basis of two pieces of evidence. The first is our decision in *Cummings* v. *Missouri*, 4 Wall. 277 (1867). The second concerns Texas' historical understanding of Fenwick's case.

---

[28] The dissent would have us dismiss our numerous and repeated invocations of the fourth category, see *supra*, at 525, because they were merely "mechanical . . . recitation[s]" in cases that did not depend on the fourth category. *Post*, at 568. Instead, the dissent would glean original meaning from *Beazell* v. *Ohio*, 269 U. S. 167 (1925), and *Collins* v. *Youngblood*, 497 U. S. 37 (1990). *Post*, at 567–568. First of all, the dissent is factually mistaken; *Cummings* v. *Missouri*, 4 Wall. 277 (1867), relied on the fourth category in invalidating the laws at issue there. See *infra* this page and 540–541. And *Hopt* v. *Territory of Utah*, 110 U. S. 574 (1884) (discussed *infra*, at 542–547), specifically *distinguished* category four. See *post*, at 570–571 ("*Hopt* . . . retain[ed] *Calder*'s fourth category"). Second, as mentioned above, neither *Beazell* nor *Collins* relied on the fourth category, so it is not apparent why the dissent would place so much emphasis on those two cases that did not depend on category four.

*Cummings* v. *Missouri* addressed an *ex post facto* challenge to certain amendments to the Missouri State Constitution made in 1865. When read together, those amendments listed a series of acts deemed criminal (all dealing with the giving of aid or comfort to anyone engaged in armed hostility against the United States), and then declared that unless a person engaged in certain professions (*e. g.*, lawyers and clergymen) swore an oath of loyalty, he "shall, on conviction [for failing to swear the oath], be punished" by a fine, imprisonment, or both. *Id.*, at 279–281. We held that these provisions violated the *Ex Post Facto* Clause.

Writing for the Court, Justice Field first observed that "[b]y an *ex post facto* law is meant one which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed; or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required." *Id.*, at 325–326. The Court then held the amendments violated the *Ex Post Facto* Clause in all these respects: some of the offenses deemed criminal by the amendments were not criminal acts before then, *id.*, at 327–328; other acts were previously criminal, but now they carried a greater criminal sanction, *id.*, at 328; and, most importantly for present purposes, the amendments permitted conviction on less testimony than was previously sufficient, because they "subvert the presumptions of innocence, and alter the rules of evidence, which heretofore, under the universally recognized principles of the common law, have been supposed to be fundamental and unchangeable," *ibid.* The Court continued: "They assume that the parties are guilty; they call upon the parties to establish their innocence; and they declare that such innocence can be shown only in one way—by an inquisition, in the form of an expurgatory oath, into the consciences of the parties." *Ibid.*

It is correct that *Cummings* held Missouri's constitutional amendments invalid under the fourth category because

they reversed the burden of proof. But *Cummings* nowhere suggests that a reversal of the burden of proof is all the fourth category encompasses. And we think there is no good reason to draw a line between laws that lower the burden of proof and laws that reduce the quantum of evidence necessary to meet that burden; the two types of laws are indistinguishable in all meaningful ways relevant to concerns of the *Ex Post Facto* Clause. See *supra*, at 530–534; see also *Cummings*, 4 Wall., at 325 ("The legal result must be the same, for what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows").

As for Texas' second piece of evidence, it asserts that the law in Fenwick's case, requiring two witnesses to convict a person for high treason, traces its origins to the ancient Roman law concept known as the "rule of number," under which "the probative value of testimony would be increased if others testifying to the same facts swore an oath." Brief for Respondent 20. The "less testimony" to which Fenwick's case refers, the argument runs, concerns lowering the probative value required to convict, *i. e.,* a reduction in the burden of proof.

Even if that historical argument were correct, the same response to Texas' *Cummings*-based argument is applicable. But we think the historical premise is mistaken. If the testimony of one witness rather than two truly reflected a less credible showing, and if the House of Commons truly thought it labored under a lesser burden of proof, then one would expect some sort of reference to that in Fenwick's case. Yet the few direct references to the burden of proof that were made during the debates are to the contrary; they indicate something roughly the equivalent of a beyond-a-reasonable-doubt standard.[29] And at least one Member expressly de-

---

[29] See, *e. g.,* Proceedings 75 ("If upon what I hear, I am of Opinion, he is notoriously Guilty, I shall freely pass the Bill. If I do so much as doubt that he is Guilty, according to the old Rule, *Quod dubitas ne feceris*

clared that the number of witnesses testifying bore no relationship to the overall credibility of the Crown's case.[30] It also appears that "[a]fter the middle of the 1600s there never was any doubt that the common law of England in jury trials rejected entirely" the Roman law concept of the rule of number. Wigmore, Required Numbers of Witnesses; A Brief History of the Numerical System in England, 15 Harv. L. Rev. 83, 93 (1901). Though the treason statute at issue in Fenwick's case, and related antecedent acts, have a superficial resemblance to the rule of number, those acts in fact reflected a concern with prior monarchical abuses relating to the specific crime of treason, rather than any vestigial belief that the number of witnesses is a proxy for probative value. *Id.*, at 100–101; see also 7 J. Wigmore, Evidence § 2037, pp. 353–354 (J. Chadbourn rev. 1978).

## VIII

Texas argues (following the holding of the Texas Court of Appeals) that the present case is controlled by *Hopt* v. *Territory of Utah,* 110 U. S. 574 (1884), and *Thompson* v. *Missouri,* 171 U. S. 380 (1898). In *Hopt,* the defendant was convicted of murder. At trial, the prosecution introduced the testimony of a convicted felon that tended to inculpate the defendant. Hopt objected to the competency of the witness on the basis of a law in place at the time of the alleged murder, which stated: " '[T]he rules for determining the competency of witnesses in civil actions are applicable also to criminal actions . . . .' " The relevant civil rules, in turn, specified that " 'all persons, without exception, . . . may be witnesses in any action or proceeding,' " but " 'persons against whom judgment has been rendered upon a conviction

---

[where you doubt, do nothing], I shall not be for it . . ."). See also *Coffin* v. *United States,* 156 U. S. 432, 456 (1895).

[30] "[O]ne single Witness, if credited by Twelve Jury-men, is sufficient; and an Hundred Witnesses, if not so credited, is not sufficient to Convict a Person of a Capital Crime." Proceedings 210; see also *id.,* at 223–226.

for felony ... shall not be witnesses.'" 110 U. S., at 587–588. After the date of the alleged offense, but prior to defendant's trial, the last provision (excluding convicted felons from being witnesses) was repealed.

The defendant argued that the retrospective application of the felon witness-competency provision violated the *Ex Post Facto* Clause. Because of the emphasis the parties (and the dissent) have placed on *Hopt*, it is worth quoting at length this Court's explanation for why it rejected the defendant's argument:

> "Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; *nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.*
>
> "The crime for which the present defendant was indicted, the punishment prescribed therefor, and *the quantity or the degree of proof necessary to establish his guilt*, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the compe-

tency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offence charged." *Id.*, at 589–590 (emphases added).

*Thompson* v. *Missouri*, also relied upon by Texas, involved a similar *ex post facto* challenge to the retrospective application of a law permitting the introduction of expert handwriting testimony as competent evidence, where the rule in place at the time of the offense did not permit such evidence to be introduced. Mainly on the authority of *Hopt*, the Court rejected Thompson's *ex post facto* challenge as well.

Texas' reliance on *Hopt* is misplaced. Article 38.07 is simply not a witness competency rule.[31] It does not "simply enlarge the class of persons who may be competent to testify," and it does not "only remove existing restrictions upon the competency of certain classes of persons as witnesses." 110 U. S., at 589–590. Both before and after the amendment, the victim's testimony was competent evidence. Texas Rule of Criminal Evidence 601(a) already prescribes that "[e]very person is competent to be a witness except as otherwise provided in these rules," and Rule 601(a)(2) already contains its own provision respecting child wit-

---

[31] We recognize that the Court of Appeals stated Article 38.07 "merely 'removes existing restrictions upon the competency of certain classes of persons as witnesses,'" 963 S. W. 2d, at 836 (quoting *Hopt*, 110 U. S., at 590); see *supra*, at 520. Whether a state law is properly characterized as falling under the *Ex Post Facto* Clause, however, is a federal question we determine for ourselves. Cf. *Lindsey* v. *Washington*, 301 U. S. 397, 400 (1937).

nesses.[32] As explained earlier, see *supra*, at 517–518, 531–533, Article 38.07 is a sufficiency of the evidence rule. As such, it does not merely "regulat[e] . . . the mode in which the facts constituting guilt may be placed before the jury," (Rule 601(a) already does that), but governs the sufficiency of those facts for meeting the burden of proof. Indeed, *Hopt* expressly *distinguished* witness competency laws from those laws that "alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed." 110 U. S., at 589; see also *id.*, at 590 (felon witness law "leav[es] untouched . . . the amount or degree of proof essential to conviction").

It is profitable, in this respect, to compare the statutes in *Hopt* and *Thompson* with the text of Article 38.07. The law in *Hopt* proscribed a " 'rul[e] for determining the competency of witnesses' " that stated " 'persons . . . convict[ed of a] felony . . . shall not be witnesses.' " 110 U. S., at 587–588. The statute in *Thompson*, similarly, specified that " 'comparison of a disputed writing . . . shall be permitted to be made by witnesses, and such writings . . . may be submitted to the court and jury as evidence.' " 171 U. S., at 381. Article 38.07, however, speaks in terms of whether "[a] convic-

---

[32] That subsection contains an exception for "[c]hildren or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated."

It is also worth observing that before 1986, Rule 601(a) was codified as Tex. Code Crim. Proc. Ann., Art. 38.06 (Vernon 1979)—the section immediately preceding the law at issue in this case. (The provision then read: "All persons are competent to testify in criminal cases," and contained a similar exception for child witnesses.) We think it fair to infer that Texas was well aware of the differences in the language used in these adjacent provisions, and understood that the laws served two different functions. The dissent views Article 38.07 as an exception to the general rule of former Article 38.06. It finds it logical that the exception would be placed next to the general rule, *post*, at 564, n. 8, but does not suggest a reason why it would be logical for the supposed exception to be phrased in language so utterly different from the general rule.

tion . . . is supportable on" certain evidence. It is Rule 601(a), not Article 38.07, that addresses who is "competent to testify." We think the differences in these laws are plain.[33]

Moreover, a sufficiency of the evidence rule resonates with the interests to which the *Ex Post Facto* Clause is addressed in a way that a witness competency rule does not. In particular, the elements of unfairness and injustice in subverting the presumption of innocence are directly implicated by rules lowering the quantum of evidence required to convict. Such rules will *always* run in the prosecution's favor, because they always make it easier to convict the accused. This is so even if the accused is not in fact guilty, because the coercive pressure of a more easily obtained conviction may induce a defendant to plead to a lesser crime rather than run the risk of conviction on a greater crime. Witness competency rules, to the contrary, do not necessarily run in the State's favor. A felon witness competency rule, for example, might help a defendant if a felon is able to relate credible exculpatory evidence.

Nor do such rules necessarily affect, let alone subvert, the presumption of innocence. The issue of the admissibility of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant. Evidence admissibility rules do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained. Prosecutors may satisfy all the requirements of any number of witness competency

---

[33] The dissent seems unwilling to concede this distinction. Though it admits that under Article 38.07 the uncorroborated victim is "not literally forbidden from testifying," *post*, at 563, it also insists that testimony is "inadmissible," *post*, at 571, and that "the jury will not be permitted to consider it," *post*, at 555, n. 3. See also *post*, at 557, 565 (referring to Article 38.07 as a rule about witness "credibility"); *post*, at 556, 570, 575 (referring to Texas' law as a rule of "admissibility"); *post*, at 553, 557, 563, 564, and n. 8, 575 (referring to the law as one about "competency"). We think it is clear from the text of Article 38.07 and Rule 601, however, that the victim's testimony alone is not inadmissible; it is just insufficient.

rules, but this says absolutely nothing about whether they have introduced a quantum of evidence sufficient to convict the offender. Sufficiency of the evidence rules (by definition) do just that—they inform us whether the evidence introduced is sufficient to convict as a matter of law (which is not to say the jury *must* convict, but only that, as a matter of law, the case may be submitted to the jury and the jury may convict). In the words of Article 38.07, "[a] conviction . . . is supportable" when its requirements are met.

## IX

The dissent contends that Article 38.07 is not a sufficiency of the evidence rule. It begins its argument by describing at length how the corroboration requirement "is premised on a legislative judgment that accusations made by sexual assault victims above a certain age are not independently trustworthy." *Post*, at 556; see also *post*, at 557–559. But it does not follow from that premise that Article 38.07 cannot be a sufficiency of the evidence rule. Surely the legislature can address trustworthiness issues through witness competency rules and sufficiency of the evidence rules alike. Indeed, the statutory history to which the dissent points cuts against its own argument. Article 38.07's statutory antecedent, the dissent says, was a "replac[ement]" for the old common-law rule that seduced females were " 'incompetent' " as witnesses. *Post*, at 557, 558. In 1891, Texas substituted a law stating that " 'the female alleged to have been seduced *shall be permitted to testify*; but *no conviction* shall be had upon the testimony of the said female, *unless the same is corroborated . . . .*' " *Post*, at 558 (emphasis added). That statute was recodified as Article 38.07 in 1965, was repealed in 1973, and then replaced in 1975 by another version of Article 38.07. As reenacted, the law's language changed from "no conviction shall be had" to its current language that "[a] conviction . . . is supportable." We think this legislative history, to the extent it is relevant for interpreting the current

law, demonstrates that Texas perceived the issue of witness trustworthiness as *both* an admissibility issue *and* as a sufficiency question; that it long ago abandoned its rule that victims of these types of crimes are incompetent as witnesses; and that Article 38.07 codifies Texas' sufficiency of the evidence solution to the trustworthiness issue.

Next, the dissent argues that under Texas' law "the prosecution need not introduce the victim's testimony at all, much less any corroboration of that testimony." *Post*, at 559. Instead, "[u]nder both the old and new versions of the statute, a conviction could be sustained on the testimony of a single third-party witness, on purely circumstantial evidence, or in any number of other ways." *Ibid.* Because other avenues of prosecution—besides the victim's testimony (with or without corroboration or outcry)—remain available to the State, Article 38.07 "did not change the quantity of proof necessary to convict *in every case.*" *Post*, at 560 (emphasis added in part and deleted in part); see also *post*, at 561 ("Article 38.07 has never dictated what it takes *in all cases* . . . for evidence to be sufficient to convict" (emphasis added)). Accordingly, the dissent urges, more evidence (in the form of corroboration) is not really *required* under Article 38.07. See *post*, at 560–561, 574. It is unclear whether the dissent's argument is that laws cannot be sufficiency of the evidence rules unless they apply to *every* conviction for a particular crime, or whether the dissent means that sufficiency rules not applicable in every prosecution for a particular crime do not fall within *Calder*'s fourth category, which refers to less testimony "*required* . . . in order to convict the offender." 3 Dall., at 390 (emphasis added in part and deleted in part). Either way, the argument fails.

Fenwick's case once again provides the guide. The dissent agrees that "[t]he treason statute in effect at the time of John Fenwick's conspiracy, like the Treason Clause of our Constitution, embodied . . . a quantitative sufficiency [of the evidence] rule." *Post*, at 573. But, it argues, Fen-

wick's law and the Treason Clause are different from Article 38.07; with the first two laws, "two witnesses [were] *necessary* to support a conviction," *ibid.* (emphasis added), whereas with Article 38.07, the victim's testimony plus corroboration is not "*necessary* to convict *in every case*," *post,* at 560 (emphasis added). But a closer look at Fenwick's law and at the Treason Clause shows that this supposed distinction is simply incorrect. Fenwick's law stated that no person could be convicted of high treason "but by and upon the Oaths and Testimony of Two lawfull Witnesses . . . *unlesse the Party indicted and arraigned or tryed shall willingly without violence in open Court confesse the same or shall stand Mute or refuse to plead* . . ." See n. 15, *supra* (emphasis added). And the Treason Clause, of course, states that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, *or on Confession in open Court.*" U. S. Const., Art. III, §3 (emphasis added). Plainly, in neither instance were two witnesses "*necessary* to support a conviction," as the dissent claims. Accordingly, its assertion that Article 38.07 "is nothing like the two-witness rule on which Fenwick vainly relied" appears erroneous, as does its accusation that our reliance on Fenwick's case "simply will not wash." *Post,* at 573.[34]

The dissent's final argument relies upon *Hopt* and runs something like this. The "effect" of Article 38.07, it claims, is the same, in certain cases, as a witness credibility rule. See *post,* at 559, 563–566, 575. However differently *Hopt*-

---

[34] Perhaps one can draw a distinction between convictions based on confessions in open court and convictions based on third-party evidence and the like (though how such a distinction would comport with the language of the fourth category is not apparent). For example, an accused's confession might be thought to be outside of the State's control. But see n. 24, *supra.* It is not clear at all, though, that the availability of evidence other than the victim's testimony is any more within the State's control than is the defendant's confession.

type laws and Article 38.07 may seem to operate on their face, in practical application (at least in certain instances) their consequences are no different, and, accordingly, they ought to be treated alike. For example, if there were a rule declaring a victim to be incompetent to testify unless she was under a certain age at the time of the offense, or had made an outcry within a specified period of time, or had other corroborating evidence, and the prosecution attempted to rest its case on the victim's testimony alone without satisfying those requirements, the end result would be a judgment of acquittal. *Post,* at 564–565. Likewise, under Article 38.07, if the prosecution attempts to rest its case on the victim's testimony alone without satisfying the Article's requirements, the result would also be an acquittal. Thus, *Hopt*-type laws and Article 38.07 should be treated the same way for *ex post facto* purposes.

This argument seeks to make *Hopt* controlling by ignoring what the case says. *Hopt* specifically distinguished laws that "alter the degree, or lessen the amount or measure, of the proof" required to convict from those laws that merely respect what kind of evidence may be introduced at trial. See *supra,* at 545. The above argument, though, simply denies any meaningful distinction between those types of laws, on the premise that they produce the same results in some situations. See *post,* at 563 ("Such a victim is of course not literally forbidden from testifying, but that cannot make the difference for *Ex Post Facto* Clause purposes between a sufficiency of the evidence rule and a witness competency rule"); *post,* at 571 ("*Hopt* cannot meaningfully be distinguished from the instant case"). In short, the argument finds *Hopt* controlling by erasing the case's controlling distinction.

The argument also pays no heed to the example laid down by Fenwick's case. Surely we can imagine a witness competency rule that would operate in a manner similar to the law in that case (*e. g.,* a witness to a treasonous act is not

competent to testify unless corroborated by another witness). Plainly, the imagined rule does not mean that Fenwick's case is not an example of an *ex post facto* law. But if that is so, why should it be any different for Article 38.07? Just as we can imagine a witness competency rule that would operate similarly to the statute in Fenwick's case, the above argument imagines a witness competency rule that operates similarly to Article 38.07. If the former does not change our view of the law in Fenwick's case, why should the latter change our view in the present circumstances?

Moreover, the argument fails to account for what *Calder's* fourth category actually says, and tells only half the story of what a witness competency rule does. As for what *Calder* says, the fourth category applies to "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." 3 Dall., at 390 (emphasis deleted). The last six words are crucial. The relevant question is whether the law affects the quantum of evidence required *to convict;* a witness competency rule that (in certain instances at least) has the practical effect of telling us what evidence would result in *acquittal* does not really speak to *Calder's* fourth category.

As for relating only half the story, the dissent's argument rests on the assertion that sometimes a witness competency rule will result in acquittals in the same instances in which Article 38.07 would also demand an acquittal. That may be conceded, but it is only half the story—and, as just noted, not the most relevant half. The other half concerns what a witness competency rule has to say about the evidence "required . . . in order to convict the offender." The answer is, nothing at all. As mentioned earlier, see *supra,* at 546–547, prosecutors may satisfy all the requirements of any number of witness competency rules, but this says absolutely nothing about whether they have introduced a quantum of

evidence sufficient to convict the offender. Sufficiency of the evidence rules, however, tell us precisely that.[35]

## X

For these reasons, we hold that petitioner's convictions on counts 7 through 10, insofar as they are not corroborated by other evidence, cannot be sustained under the *Ex Post Facto* Clause, because Texas' amendment to Article 38.07 falls within *Calder*'s fourth category. It seems worth remembering, at this point, Joseph Story's observation about the Clause:

> " 'If the laws in being do not punish an offender, let him go unpunished; let the legislature, admonished of the

---

[35] The dissent contends that the witness competency rule "would produce the same results" as a sufficiency rule, *post,* at 564–565 (emphasis deleted), and above we have been willing to assume as much for argument's sake. But the dissent's statement is not entirely correct. It would not be the witness competency rule that would produce the same result, but that rule in combination with the normally operative sufficiency rule. Failure to comply with the requirements of Article 38.07, by contrast, would mean that the evidence is insufficient to convict *by the force of that law alone.* That difference demonstrates the very distinction between witness competency rules and sufficiency of the evidence rules, points to precisely the distinction that *Hopt* drew, and illustrates why (contrary to the dissent's contention) our conclusion about Article 38.07 does not apply to "countless evidentiary rules." *Post,* at 571.

That is also why the dissent's statement that we have been "misdirected" by the plain text of Article 38.07 is wrong. *Post,* at 564. The dissent asserts that "any evidence" admitted under an applicable rule of evidence could "potentially" support a conviction, *ibid.,* and therefore Article 38.07's explicit specification that a conviction "is supportable" if its requirements are met does not distinguish it from ordinary rules of evidence. Once again, we point out that whether certain evidence can support a conviction is *not* determined by the rule of admissibility itself, but by some other, separate, normally operative sufficiency of the evidence rule. The distinction the dissent finds illusive is that Article 38.07 *itself* determines the evidence's sufficiency (that is why it is a sufficiency of the evidence rule), while witness competency rules and other ordinary rules of evidence do not (because they are admissibility rules, not sufficiency rules). See also n. 23, *supra.*

defect of the laws, provide against the commission of future crimes of the same sort. The escape of one delinquent can never produce so much harm to the community, as may arise from the infraction of a rule, upon which the purity of public justice, and the existence of civil liberty, essentially depend.'" 3 Commentaries on the Constitution § 1338, at 211, n. 2.

And, of course, nothing in the *Ex Post Facto* Clause prohibits Texas' *prospective* application of its amendment. Accordingly, the judgment of the Texas Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE KENNEDY join, dissenting.

The Court today holds that the amended version of Article 38.07 of the Texas Code of Criminal Procedure reduces the amount of proof necessary to support a sexual assault conviction, and that its retroactive application therefore violates the *Ex Post Facto* Clause. In so holding, the Court misreads both the Texas statute and our precedents concerning the *Ex Post Facto* Clause. Article 38.07 is not, as the Court would have it, most accurately characterized as a "sufficiency of the evidence rule"; it is in its essence an evidentiary provision dictating the circumstances under which the jury may credit victim testimony in sexual offense prosecutions. The amended version of Article 38.07 does nothing more than accord to certain victims of sexual offenses full testimonial stature, giving them the same undiminished competency to testify that Texas extends to witnesses generally in the State's judicial proceedings. Our precedents make clear that such a witness competency rule validly may be applied to offenses committed before its enactment. I therefore dissent.

\* \* \*

Petitioner Scott Leslie Carmell began sexually abusing his stepdaughter, "K. M.," in the spring of 1991, when K. M. was 13 years old. He continued to do so through March 1995. The specific question before the Court concerns Carmell's sexual assault on K. M. in June 1992, when K. M. was 14.[1] K. M. did not inform anyone about that assault or about any of Carmell's other sexual advances toward her until sometime around March 1995, when she told a friend and then her mother, Eleanor Alexander. Alexander went to the police, and Carmell was arrested and charged in a 15-count indictment.

Under Article 38.07 of the Texas Code of Criminal Procedure as it stood at the time of the assault, a conviction for sexual assault was supportable on the uncorroborated testimony of the victim if the victim was younger than 14 years old at the time of the offense. If the victim was 14 years old or older, however, the victim's testimony could support a conviction only if that testimony was corroborated by other evidence. One form of corroboration, specifically described in Article 38.07 itself, was known as "outcry": The victim's testimony could support a conviction if he or she had informed another person, other than the defendant, about the offense within six months of its occurrence. Tex. Code Crim. Proc. Ann., Art. 38.07 (Vernon 1983).

Article 38.07 was amended in 1993. Under the new version, which was in effect at the time of Carmell's trial, the victim's uncorroborated testimony can support a conviction as long as the victim was under 18 years of age at the time of the offense. Tex. Code Crim. Proc. Ann., Art. 38.07 (Vernon Supp. 2000). The corroboration requirement con-

---

[1] The Court correctly notes that Carmell's *ex post facto* challenge applies equally to three other counts on which he was convicted. *Ante*, at 518–519. This Court's grant of review, however, was limited to the first question presented in Carmell's petition for certiorari, which encompassed only the count charging the June 1992 assault. Pet. for Cert. 4.

tinues in force for victims aged 18 or older, with a modified definition of outcry not material here. Thus, under the version of Article 38.07 in effect at the time of Carmell's trial but not the version in effect at the time of the offense, his conviction was supportable by the uncorroborated testimony of K. M. The new version of Article 38.07 was applied at Carmell's trial, and he was convicted.[2] Carmell argues that the application of the new version of Article 38.07 to his trial violated the *Ex Post Facto* Clause, U. S. Const., Art. I, § 10, cl. 1.

## I

A proper understanding of Article 38.07 of the Texas Code of Criminal Procedure is central to this case. Accordingly, I turn first to the effect and purpose of that statute.

The effect of Article 38.07 in sexual offense prosecutions is plain. If the victim is of a certain age, the jury, in assessing whether the prosecution has met its burden of demonstrating guilt beyond a reasonable doubt, must give no weight to her testimony unless that testimony is corroborated, either by other evidence going directly to guilt or by "outcry."[3] For victims (such as K. M.) who were between the ages of 14 and

---

[2] The Texas Court of Appeals did not rule on whether the State in fact did corroborate K. M.'s testimony at trial. I note the testimony of K. M.'s mother that when she visited Carmell in jail and told him he needed to confess if he was sorry for what he had done, he wrote "'adultery with [K. M.]'" on a piece of paper. 963 S. W. 2d 833, 835 (Tex. App. 1998). That testimony might count as corroboration. Because this question is outside the grant of certiorari, I (like the Court, see *ante*, at 519, n. 4) do not further address it.

[3] At first glance one might object that the statute permits the jury to give such testimony *some* weight, just not enough to support a conviction. See, *e. g., ante,* at 546, n. 33 (contending that under the old Article 38.07, "the victim's testimony alone is not inadmissible, it is just insufficient"). A moment's reflection should reveal, however, that this distinction is illusory. If a particular item of evidence cannot by itself support a conviction, then the jury will not be permitted to consider it unless and until corroborating evidence is introduced.

18 at the time of the offense, the 1993 amendment repealed this corroboration requirement. The amended version of Article 38.07 thus permits sexual assault victims between 14 and 18 to have their testimony considered by the jury in the same manner and with the same effect as that of witnesses generally in Texas prosecutions.

This sort of corroboration requirement—still embodied in Article 38.07 for victims aged 18 or older—is a common, if increasingly outmoded, rule of evidence. Its purpose is to rein in the admissibility of testimony the legislature has deemed insufficiently credible standing alone. Texas' requirement of corroboration or outcry, like similar provisions in other jurisdictions, is premised on a legislative judgment that accusations made by sexual assault victims above a certain age are not independently trustworthy. See *Villareal* v. *State*, 511 S. W. 2d 500, 502 (Tex. Crim. App. 1974) ("The basis of this rule is that the failure to make an outcry or promptly report the rape diminishes the credibility of the prosecutrix."); cf., *e. g.*, *Battle* v. *United States*, 630 A. 2d 211, 217 (D. C. 1993) (evidence of outcry "rebuts an implied charge of recent fabrication, which springs from some jurors' assumptions that sexual offense victims are generally lying and that the victim's failure to report the crime promptly is inconsistent with the victim's current statement that the assault occurred").

Legislatures in many States, including Texas, have enacted similar evidentiary provisions requiring corroboration for the testimony of other categories of witnesses, particularly accomplices. See, *e. g.*, Tex. Code Crim. Proc. Ann., Art. 38.14 (Vernon Supp. 2000) ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . . ."). Such provisions—generally on the wane but still in force in several States—are, like Article 38.07, designed to ensure the credibility of the relevant witness. See, *e. g.*, *State* v. *Haugen*, 448 N. W. 2d 191, 194

(N. D. 1989) ("The purpose of corroborating evidence is to show that accomplices are reliable witnesses and worthy of credit."); *Holladay* v. *State*, 709 S. W. 2d 194, 196 (Tex. Crim. App. 1986) ("Because such a witness [*i. e.*, an accomplice] is usually deemed to be corrupt, his testimony is always looked upon with suspicion."); *Fleming* v. *State*, 760 P. 2d 208, 209–210 (Okla. Crim. App. 1988) ("The purpose behind the requirement of corroboration is to protect an accused from being falsely implicated by another criminal in the hope of clemency, a desire for revenge, or for any other reason.").

I make no judgment here as to the propriety of the Texas Legislature's decision to view the testimony of certain sexual assault victims in the same light as that of accomplices. *Ex post facto* analysis does not depend on an assessment of a statute's wisdom. For current purposes it suffices to note that Article 38.07's corroboration requirement rests on the same rationale that underpins accomplice corroboration requirements: the notion that a particular witness, because of his or her role in the events at issue, might not give trustworthy testimony. See *Reed* v. *State*, 991 S. W. 2d 354, 361 (Tex. App. 1999) ("Generally speaking, the need to corroborate the testimony of a sexual assault victim stems from the notion that the victim, if over the age of consent, could be an accomplice rather than a victim."); *Hernandez* v. *State*, 651 S. W. 2d 746, 751 (Tex. Crim. App. 1983) (concurring opinion adopted on rehearing) (Article 38.07's corroboration requirement "was meant to deal *only* with testimony of a victim of a sexual offense who, for one reason or another, was held to be an 'accomplice witness' and, perforce, whose testimony must be corroborated.").

The history of Article 38.07 bears out the view that its focus has always been on the competency and credibility of the victim as witness. The origins of the statute could be traced to the fact that in Texas, "for many years a seduced female was an incompetent witness as a matter of law." *Holladay*, 709 S. W. 2d, at 200. See, *e. g.*, *Cole* v. *State*, 40

Tex. 147 (1874); see also *Hernandez,* 651 S. W. 2d, at 751–752 (tracing the current Article 38.07 to the earlier seduction victim competency rule). In 1891, this common-law disability was lifted by statute and replaced by a corroboration requirement: "In prosecutions for seduction . . . the female alleged to have been seduced shall be permitted to testify; but no conviction shall be had upon the testimony of the said female, unless the same is corroborated by other evidence tending to connect the defendant with the offense charged." Tex. Rev. Crim. Stat., Tit. 8, ch. 7, Art. 789 (1911). The application of this statute to offenses committed before its enactment was upheld by the Texas courts on the authority of *Hopt* v. *Territory of Utah,* 110 U. S. 574 (1884). See *Mrous* v. *State,* 31 Tex. Crim. App. 597, 21 S. W. 764 (1893). The corroboration requirement for seduction prosecutions, recodified in 1965 at Tex. Code Crim. Proc. Ann., Art. 38.07, remained in effect until 1973, when the entire 1925 Penal Code (including the offense of seduction) was repealed.

In 1975, Article 38.07 was enacted substantially in its present form. As revised, the article covered all sexual offenses in Chapter 21 of the Texas Penal Code; however, it contained no express exemption from the corroboration requirement for the testimony of the youngest victims. Tex. Code Crim. Proc. Ann., Art. 38.07 (Vernon 1979). The exemption for victims under the age of 14 was added in 1983, and extended in 1993 to cover those under the age of 18, as already described. As initially proposed, the 1993 change would have eliminated the corroboration/outcry requirement altogether. House Research Organization, Texas House of Representatives, Daily Floor Report 13 (Mar. 15, 1993), Lodging of Petitioner. Supporters of the proposal maintained that "[v]ictims in sexual assault cases are no more likely to fantasize or misconstrue the truth than the victims of most other crimes, which do not require corroboration of testimony or previous 'outcry.' Juries can decide if a witness is credible. . . . Most states no longer require this type of corrobora-

tion; neither should Texas." *Id.*, at 14. The historical development of Article 38.07 reveals a progressive alleviation of restrictions on the competency of victim testimony, not a legislative emphasis on the quantum of evidence needed to convict.

The version of Article 38.07 applied at Carmell's trial was thus, in both effect and purpose, an evidentiary rule governing the weight that may be given to the testimony of sexual assault victims who had attained the age of 14. The Court's efforts to paint it as something more than that are detached from the statute's moorings and are consequently unpersuasive.

To begin with, it is beyond doubt that Article 38.07 does not establish an element of the offense. See *Love* v. *State*, 499 S. W. 2d 108, 108 (Tex. Crim. App. 1973) ("[O]utcry is not one of the elements of the offense charged."). To convict a defendant of sexual assault in Texas today as before 1993, the prosecution need not introduce the victim's testimony at all, much less any corroboration of that testimony. The Court is therefore less than correct in asserting that "[u]nder the law in effect at the time the acts were committed, the prosecution's case was legally insufficient and petitioner was entitled to a judgment of acquittal, unless the State could produce both the victim's testimony *and* corroborative evidence." *Ante*, at 530. Under both the old and new versions of the statute, a conviction could be sustained on the testimony of a single third-party witness, on purely circumstantial evidence, or in any number of other ways—so long as the admissible evidence presented is sufficient to prove all of the elements of the offense beyond a reasonable doubt.[4] And under either version of Article 38.07, of course,

---

[4] Not only is corroborated victim testimony not *necessary* for a conviction under the former version of Article 38.07, it is not always *sufficient.* Under both the old and new versions of the statute, the prosecution's evidence will not support a conviction unless it is adequate to prove all the elements of the offense beyond a reasonable doubt.

the accused could be convicted, like any other defendant, on the basis of a guilty plea or a voluntary confession. Article 38.07, in other words, does not define "sexual assault proven by corroborated victim testimony" as a distinct offense from "sexual assault." Rather, the measure operates only to restrict the State's method of proving its case.[5]

And it does so without affecting in any way the burden of persuasion that the prosecution must satisfy to support a conviction. Under both the old and new versions of the statute, the applicable standard is proof beyond a reasonable doubt. The amendment in 1993 that repealed the corroboration requirement for victims between the ages of 14 and 18 did nothing to change that standard.

The Court recognizes that Article 38.07 does not affect the applicable burden of persuasion, see *ante*, at 539, but several times it asserts that the amended version of the statute "changed the *quantum* of evidence *necessary* to sustain a conviction," *ante*, at 530 (emphasis added). See also *ante*, at 531 (amended law "permitted petitioner to be convicted with less than the previously *required quantum* of evidence"); *ante*, at 532–533 (amended law "[r]educ[es] the *quantum* of evidence *necessary* to meet the burden of proof" (emphases added)). If by the word "quantum" the Court means to refer to the burden of persuasion, these statements are simply incorrect and contradict the Court's own acknowledgment. And if, as appears more likely, "quantum" refers to some required *quantity* or *amount* of proof, the Court is also wrong. The partial repeal of Article 38.07's corroboration requirement did not change the *quantity* of proof necessary to convict in every case, for the simple reason that Texas has never required the prosecution to introduce any particular

---

[5] By the same reasoning, the repeal of the corroboration requirement for victims between the ages of 14 and 18 plainly did not deprive sexual assault defendants of any defense they previously enjoyed.

number of witnesses or items of proof to support a sexual assault conviction.[6]

The Court also declares several times that the amended version of Article 38.07 "subverts the presumption of innocence." See *ante,* at 532; see also *ante,* at 533, nn. 22, 23, 546. The phrase comes from *Cummings* v. *Missouri,* 4 Wall. 277 (1867), in which the Court struck down a series of post-Civil War amendments to the Missouri Constitution that imposed penalties on persons unable or unwilling to swear an oath that they had not aided the Confederacy. The amendments, the Court said in *Cummings,* "subvert the presumptions of innocence" because "[t]hey assume that the parties are guilty [and] . . . call upon [them] to establish their innocence" by swearing the oath. *Id.,* at 328. Nothing of the kind is involved here. Article 38.07 did not impose a presumption of guilt on Carmell and then saddle him with the task of overcoming it. The burden of persuasion remained at all times with the State. See Tex. Code Crim. Proc. Ann., Art. 38.03 (Vernon Supp. 2000). Carmell's presumption of innocence is thus untouched by the current Article 38.07's recognition of K. M.'s full testimonial stature.

The Court places perhaps its greatest weight on the "sufficiency of the evidence" label, see *ante,* at 547–552, but the label will not stick. As just noted, Article 38.07 has never dictated what it takes in all cases, quantitatively or qualitatively, for evidence to be sufficient to convict. To the contrary, under both the old and new versions of the statute the

---

[6] Moreover, even in a case founded on the victim's testimony, the pre-1993 version of Article 38.07 would permit the prosecution to corroborate that testimony without introducing any additional evidence going to the defendant's guilt, because corroboration could be provided by outcry, which is hearsay and inadmissible to prove the truth of the matter asserted. See *Heckathorne* v. *State,* 697 S. W. 2d 8, 12 (Tex. App. 1985) ("[A]n outcry should not be admitted for its truth, but merely as evidence that the victim informed someone of the offense.").

prosecution's admissible evidence will be sufficient to support a conviction if a rational factfinder presented with that evidence could find the defendant guilty beyond a reasonable doubt. The 1993 repeal of the corroboration requirement for victims between the ages of 14 and 18 did not lower that "sufficiency of the evidence" hurdle; it simply expanded the range of methods the State could use to surmount it.

To be sure, one might descriptively say in an individual case that the uncorroborated testimony of the victim would be "sufficient" to convict under the new version of Article 38.07 and "insufficient" under the old. But that cannot be enough to invalidate a statute as *ex post facto*. If it were, then all evidentiary rules that work to the defendant's detriment would be unconstitutional as applied to offenses committed before their enactment—an outcome our cases decisively reject. See *infra*, at 570–571 (discussing *Thompson* v. *Missouri,* 171 U. S. 380 (1898), and *Hopt* v. *Territory of Utah,* 110 U. S. 574 (1884), which upheld the retroactive application of evidentiary rules governing the authentication of documents and the competency of felons to testify, respectively). A defendant whose conviction turned, for example, on an item of hearsay evidence considered inadmissible at the time of the offense but made admissible by a later enacted statute might accurately describe the new statute as one that permits conviction on less evidence than was "sufficient" under prior law. But our precedents establish that such a defendant has no valid *ex post facto* claim. See *infra*, at 570–571. Neither does Carmell.

The Court attempts to distinguish Article 38.07 from garden-variety evidentiary rules by asserting that the latter "are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case." *Ante*, at 533, n. 23. The truth of this assertion is not at all clear. Evidence is never admissible in its own right; it must be admitted for some purpose. Rules of admissibility typically take that basic fact into account, often restricting the

use of evidence in a way that systematically disadvantages one side. Consider, for example, a rule providing that evidence of a rape victim's sexual relations with persons other than the accused is admissible to prove consent, or a rule providing that evidence of a sexual assault defendant's prior sexual offenses is inadmissible to show a propensity to commit that type of crime. A statute repealing either of the above rules would "*always* run in the prosecution's favor ... [by] mak[ing] it easier to convict the accused." *Ante*, at 546.[7] Yet no one (until today) has suggested that such a statute would be *ex post facto* as applied to offenses committed before its enactment.

The Court resists the conclusion that Article 38.07 functions as a rule of witness competency by asserting that "[b]oth before and after the amendment, the victim's testimony was competent evidence." *Ante*, at 544. In all but the most technical sense that blanket statement is dubious. If the victim was 14 years old or older at the time of the offense (18 or older under the amended statute) and her testimony is unbolstered by corroboration or outcry, the jury may not credit that testimony in determining whether the State has met its burden of proof. Such a victim is of course not literally forbidden from testifying, but that cannot make the difference for *Ex Post Facto* Clause purposes between a sufficiency of the evidence rule and a witness competency rule. Evidence to which the jury is not permitted to assign weight is, in reality, incompetent evidence.

---

[7] Cf. Fed. Rules Evid. 412(a)(1) (restricting admissibility of "[e]vidence offered to prove that any alleged victim [of sexual misconduct] engaged in other sexual behavior"); 412(b)(1)(B) (providing that "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused" is admissible to prove consent); 413(a) (providing that "evidence of the defendant's commission of another offense or offenses of sexual assault is admissible" in sexual assault cases notwithstanding Rule 404(b)'s general prohibition on the introduction of prior bad acts evidence "to show action in conformity therewith").

Perhaps the Court has been misdirected by the wording of Article 38.07, which speaks in both its old and new versions of evidence upon which a "conviction . . . is supportable." See *ante*, at 547. That sounds like a "sufficiency of the evidence rule," until one realizes that any evidence admissible in a criminal case—*i. e.*, any evidence that a jury is entitled to consider in determining whether the prosecution has met its burden of persuasion—is at least potentially evidence upon which a "conviction . . . is supportable." Conversely, as I have just said, evidence to which the jury may give no weight in making that determination is effectively inadmissible.[8]

In short, no matter how it is phrased, the corroboration requirement of Article 38.07 is functionally identical to a conditional rule of witness competency. If the former version of Article 38.07 had provided instead that "the testimony of the victim shall be inadmissible to prove the defendant's guilt unless corroborated," *it would produce the*

---

[8] It is thus no wonder that before 1986 the general rule of witness competency was codified at Article 38.06 of the Texas Code of Criminal Procedure, and the statute now at issue immediately followed it. Article 38.07 was an exception to the general rule laid out in Article 38.06. It is logical to put an exception right after the rule. Yet the Court draws the opposite inference from that juxtaposition. See *ante*, at 545, n. 32.

The Court's related observation that Texas' general witness competency statute "already contains its own provision respecting child witnesses," *ante*, at 544–545, is true but irrelevant. Article 38.07's corroboration requirement has nothing to do with the diminished credibility of child witnesses. Indeed, the statute has always permitted juries to credit fully the testimony of sexual offense victims *below* a certain age (first 14, then 18) without any corroboration, the reason apparently being that the legislature considers victims under a certain age to be *too young* to consent to sex and then lie about it. See, *e. g.*, *Scoggan* v. *State*, 799 S. W. 2d 679, 681 (Tex. Crim. App. 1990); *Hernandez* v. *State*, 651 S. W. 2d 746, 752–753 (Tex. Crim. App. 1983) (concurring opinion adopted on rehearing). The corroboration requirement attaches only to victims *above* a certain age, and thus would not be appropriate for inclusion in a "provision respecting child witnesses."

*same results as the actual statute in every case.* Not "in certain instances," *ante,* at 551, or "in some situations," *ante,* at 550, but in every case.[9] Recognizing this equivalency, the Texas Court of Criminal Appeals has noted that the Texas accomplice corroboration rule is "a mere rule of evidence" even though "*statutorily* worded as a sufficiency standard." *Malik v. State,* 953 S. W. 2d 234, 240, n. 6 (1997).[10]

In sum, the function and purpose of the corroboration requirement embedded in the former version of Article 38.07 was to ensure the credibility of the victim's testimony, not otherwise to impede the defendant's conviction. Our precedents, I explain next, make clear that the retroactive repeal

---

[9] The Court contends that the effect of Article 38.07 is distinct from that of a witness competency rule because noncompliance with the former dictates acquittal *ex proprio vigore* while noncompliance with the latter dictates acquittal "in combination with the normally operative sufficiency rule." *Ante,* at 552, n. 35. This is a distinction without a difference, because the "normally operative sufficiency rule" in question—when the prosecution submits no admissible evidence, its case will be deemed insufficient—is a bedrock requirement of due process, applicable in every criminal trial.

[10] The Court observes that the characterization of a state law under the *Ex Post Facto* Clause is a federal question. *Ante,* at 544, n. 31. This undoubtedly correct observation stands in some tension, however, with the Court's reliance on the assertion that "Texas courts treat Article 38.07 as a sufficiency of the evidence rule." *Ante,* at 518, n. 2. In any event, the latter assertion is inaccurate, as *Malik*'s discussion of the accomplice corroboration rule suggests. It is true that a trial court's failure to comply with Article 38.07 results on appeal in the entry of an order of acquittal. But it is not true that the remedy on appeal for the introduction of inadmissible evidence is always a remand for a new trial. When the only evidence introduced by the prosecution is evidence that may not be considered by a jury in determining the defendant's guilt, the proper result is always acquittal. By the same reasoning, as this Court decided just this Term, when a court of appeals has found that evidence was improperly admitted in a civil trial and that the remaining evidence is insufficient, it may enter judgment as a matter of law rather than ordering a new trial. *Weisgram v. Marley Co.,* 528 U. S. 440 (2000).

of such an evidentiary rule does not violate the *Ex Post Facto* Clause.

## II

The *Ex Post Facto* Clause, this Court has said repeatedly, furthers two important purposes. First, it serves "to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver* v. *Graham*, 450 U. S. 24, 28–29 (1981).[11] Second, it "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.*, at 29; see also *Landgraf* v. *USI Film Products*, 511 U. S. 244, 267 (1994); *Miller* v. *Florida*, 482 U. S. 423, 429–430 (1987). The latter purpose has much to do with the separation of powers; like its textual and conceptual neighbor the Bill of Attainder Clause, the *Ex Post Facto* Clause aims to ensure that legislatures do not meddle with the judiciary's task of adjudicating guilt and innocence in individual cases. *Weaver*, 450 U. S., at 29, n. 10.

The Court does not even attempt to justify its extension of the Clause in terms of these two fundamental purposes. That is understandable, for today's decision serves neither purpose. The first purpose (fair warning and reliance), vital as it is, cannot tenably be relied upon by Carmell. He had ample notice that the conduct in which he engaged was illegal. He certainly cannot claim to have relied in any way on the preamendment version of Article 38.07: He tendered

---

[11] Today's opinion apart, see *ante*, at 531, n. 21, this Court has consistently stressed "'lack of fair notice'" as one of the "central concerns of the *Ex Post Facto* Clause." *Lynce* v. *Mathis*, 519 U. S. 433, 441 (1997) (quoting *Weaver* v. *Graham*, 450 U. S. 24, 30 (1981)). See also *Landgraf* v. *USI Film Products*, 511 U. S. 244, 266–267 (1994); *Miller* v. *Florida*, 482 U. S. 423, 430 (1987); *Weaver*, 450 U. S., at 28–29; *Marks* v. *United States*, 430 U. S. 188, 191–192 (1977). The implausibility of *ex ante* reliance on rules of admissibility like the one at issue here helps explain why the *Ex Post Facto* Clause has never been held to apply to changes in such rules.

no reason to anticipate that K. M. would not report the assault within the outcry period, nor any cause to expect that corroborating evidence would not turn up sooner or later. Nor is the Clause's second purpose relevant here, for there is no indication that the Texas Legislature intended to single out this defendant or any class of defendants for vindictive or arbitrary treatment. Instead, the amendment of Article 38.07 simply brought the rules governing certain victim testimony in sexual offense prosecutions into conformity with Texas law governing witness testimony generally.

In holding the new Article 38.07 unconstitutional as applied to Carmell, the Court relies heavily on the fourth category of *ex post facto* statutes enumerated by Justice Chase in his opinion in *Calder* v. *Bull,* 3 Dall. 386, 390 (1798): "Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*" Justice Chase's formulation was. dictum, of course, because *Calder* involved a civil statute and the Court held that the statute was not *ex post facto* for that reason alone. Moreover, Justices Paterson and Iredell in their own *seriatim* opinions gave no hint that they considered rules of evidence to fall within the scope of the Clause. See *id.,* at 395–397 (Paterson, J.); *id.,* at 398–400 (Iredell, J.). Still, this Court has come to view Justice Chase's categorical enumeration as an authoritative gloss on the *Ex Post Facto* Clause's reach. Just a decade ago in *Collins* v. *Youngblood,* 497 U. S. 37 (1990), for instance, this Court reiterated that "the prohibition which may not be evaded is the one defined by the *Calder* categories." *Id.,* at 46.

If those words are placed in the context of the full text of the *Collins* opinion, however, a strong case can be made that *Collins* pared the number of *Calder* categories down to three, eliminating altogether the fourth category on which the Court today so heavily relies. As long ago as 1925, in *Beazell* v. *Ohio,* 269 U. S. 167, the Court cataloged *ex post*

*facto* laws without mentioning Chase's fourth category at all. *Id.*, at 169–170. And in *Collins* the Court cited with apparent approval *Beazell*'s omission of the fourth category, 497 U. S., at 43, n. 3, declaring that "[t]he *Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id.*, at 43. *Collins* concluded by reciting in the plainest terms the prohibitions laid down by the *Ex Post Facto* Clause: A statute may not "punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed." *Id.*, at 52. This recitation conforms to *Calder*'s first three categories, but not the fourth; changes in evidentiary rules are nowhere mentioned.[12]

The majority asserts that the Court has repeatedly endorsed Justice Chase's formulation, "including, in particular, the fourth category," and it offers an impressive-looking string citation in support of the claim. *Ante*, at 525. Yet all of those cases simply quoted or paraphrased Chase's enumeration, a mechanical task that naturally entailed a recitation of the fourth category. Not one of them depended on that category for the judgment the Court reached.[13] Nei-

[12] In *California Dept. of Corrections* v. *Morales*, 514 U. S. 499, 504–505 (1995), the Court similarly enumerated the categories of *ex post facto* laws without mentioning the fourth category.

[13] The Court in *Cummings* v. *Missouri*, 4 Wall. 277 (1867), invoked the fourth category, see *id.*, at 328, but that invocation was hardly necessary to the Court's holding. In *Cummings*, as already noted, the Court invalidated on Bill of Attainder Clause and *Ex Post Facto* Clause grounds state constitutional amendments that imposed punishment on persons unable to swear an oath that they had not taken up arms against the Union in the Civil War. The Court recognized that the challenged amendments, though framed in terms of a method of proof, were "aimed at past acts,

ther did Justice Washington's opinion in *Ogden* v. *Saunders*, 12 Wheat. 213 (1827), which is quoted extensively by the Court, *ante*, at 532. In fact, the Court has never until today relied on the fourth *Calder* category to invalidate the application of a statute under the *Ex Post Facto* Clause.

It is true that the Court has on two occasions struck down as *ex post facto* the retroactive application of rules governing the functioning of the criminal trial process—but both decisions have since been overruled. In *Kring* v. *Missouri*, 107 U. S. 221 (1883), the Court held that Missouri was forbidden to apply retroactively a state constitutional amendment providing that a plea of guilty to second-degree murder would not automatically serve on retrial as an acquittal of the charge of first-degree murder. And in *Thompson* v. *Utah*, 170 U. S. 343 (1898), the Court held that a change in state law reducing the number of petit jurors in criminal trials from 12 to 8 was *ex post facto* because it deprived the defendant of "a substantial right involved in his liberty." *Id.*, at 352. The Court in *Collins* overruled both *Kring* and *Thompson* v. *Utah*, concluding that neither decision was "consistent with the understanding of the term '*ex post facto* law' at the time the Constitution was adopted." *Collins*, 497 U. S., at 47, 50, 51–52.

The Court today offers a different reading of *Collins*. It concludes that *Collins* overruled *Kring* and *Thompson* v. *Utah* because those cases improperly construed the *Ex Post Facto* Clause to cover all "substantial protections," and that the fourth *Calder* category consequently remains intact.

---

and not future acts," *id.*, at 327, for only those who had aided the Confederacy would be unable to take the expurgatory oath. The Court held that the amendments violated *Calder*'s first category by retroactively creating new offenses, 4 Wall., at 327–328, and violated the third category by retroactively imposing new punishments, *id.*, at 328. As for *Calder*'s fourth category, the Court said only that the amendments "subvert[ed] the presumptions of innocence" by "assum[ing] that the parties [we]re guilty." 4 Wall., at 328. As already discussed, *supra*, at 561, that analysis is of no help to Carmell here.

That is a plausible reading of *Collins,* and I might well be prepared to accept it, were the issue presented here. But it is not. For purposes of this case, it does not matter whether *Collins* eliminated the fourth *Calder* category or left it undisturbed. For even if the fourth category remains viable, our precedents make clear that it cannot be stretched to fit the statutory change at issue here. Those precedents— decisions that fully acknowledged the fourth *Calder* category—firmly establish that retroactively applied changes in rules concerning the admissibility of evidence and the competency of witnesses do not raise *Ex Post Facto* Clause concerns.

In *Thompson* v. *Missouri,* 171 U. S. 380 (1898), this Court upheld against *ex post facto* attack the retroactive application of a statute that permitted the introduction of previously inadmissible evidence to demonstrate the authenticity of disputed writings. The new statute, the Court reasoned, "did nothing more than remove an obstacle arising out of a rule of evidence that withdrew from the consideration of the jury testimony which, in the opinion of the legislature, tended to elucidate the ultimate, essential fact to be established, namely, the guilt of the accused." *Id.,* at 387.

The case most similar to the one before us is *Hopt* v. *Territory of Utah,* 110 U. S. 574 (1884). In that case, a statute in effect at the time of the offense but repealed by the time of trial provided that felons were incompetent to testify. The defendant, whose conviction for capital murder had been based in large part on the testimony of a felon, claimed that the application of the new law to his trial was *ex post facto.* The Court rejected the defendant's claim, adopting reasoning applicable to the instant case:

> "Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do

not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed." *Id.*, at 589.

As the quoted passage shows, the Court in *Hopt* rejected the defendant's *Ex Post Facto* Clause claim while retaining *Calder*'s fourth category. The same outcome should obtain today, for *Hopt* cannot meaningfully be distinguished from the instant case.

The Court asserts that "Article 38.07 plainly fits" the fourth *Calder* category, because "[r]equiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely 'less testimony required to convict' in any straightforward sense of those words." *Ante*, at 530. Yet to declare Article 38.07 *ex post facto* on that basis is to overrule *Hopt* without saying so. For if the amended version of Article 38.07 requires "less testimony . . . to convict," then so do countless evidentiary rules, including the felon competency rule whose retroactive application we upheld in *Hopt*. In both this case and *Hopt*, a conviction based on evidence previously deemed inadmissible was sustained pursuant to a broadened rule regarding the competency of testimonial evidence. The mere fact that the new version of Article 38.07 makes some convictions easier to obtain cannot be enough to preclude its retroactive application. "Even though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto*." *Dobbert* v. *Florida*, 432 U. S. 282, 293 (1977).

In short, the Court's expansive new reading of the *Ex Post Facto* Clause cannot be squared with this Court's prior decisions. Rather than embrace such an unprecedented approach, I would advance a "commonsense understanding of

*Calder*'s fourth category," *ante,* at 530, one that comports with our precedents and with the underlying purposes of the *Ex Post Facto* Clause: Laws that reduce the burden of persuasion the prosecution must satisfy to win a conviction may not be applied to offenses committed before their enactment. To be sure, this reading would leave the fourth category with considerably less independent effect than it would have had in Justice Chase's day, given our intervening decisions establishing the "beyond a reasonable doubt" standard as a constitutional minimum under the Due Process Clause. See, *e. g., In re Winship,* 397 U. S. 358 (1970); *Jackson* v. *Virginia,* 443 U. S. 307 (1979). But it is not a reading that necessarily renders the category meaningless even today. Imagine, for example, a statute requiring the prosecution to prove a particular sentencing enhancement factor—leadership role in the offense, say, or obstruction of justice—beyond a reasonable doubt. A new statute providing that the factor could be established by a mere preponderance of the evidence might rank as *ex post facto* if applied to offenses committed before its enactment. The same might be said of a statute retroactively increasing the defendant's burden of persuasion as to an affirmative defense.

Burdens of persuasion are *qualitative* tests of sufficiency. *Calder*'s fourth category, however, encompasses *quantitative* sufficiency rules as well, for Justice Chase did speak of a law that "receives *less* . . . testimony, than the law *required* at the time of the commission of the offence." 3 Dall., at 390 (emphasis added). Cf. *Hopt,* 110 U. S., at 590 ("Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in *amount* or degree, than was *required* when the offence was committed" might be *ex post facto.* (emphasis added)). Quantitative sufficiency rules are rare in modern Anglo-American law, but some do exist. Criminal statutes sometimes limit the prosecution to a particular form of proof, for example, the testimony of two witnesses to the same overt act. In modern Anglo-

American law, such instances have been almost exclusively confined to two contexts: perjury, see *Weiler* v. *United States*, 323 U. S. 606 (1945), and treason, see U. S. Const., Art. III, § 3, cl. 1 ("No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."). See generally Wigmore, Required Numbers of Witnesses; A Brief History of the Numerical System in England, 15 Harv. L. Rev. 83, 100–108 (1901).

The treason statute in effect at the time of John Fenwick's conspiracy, like the Treason Clause of our Constitution, embodied just such a quantitative sufficiency rule: As long as the accused traitor put the prosecution to its proof by pleading not guilty, the sworn testimony of two witnesses was necessary to support a conviction. The Court describes at great length the attainder of Fenwick, which served as a cautionary model for Justice Chase's explication of the fourth category in *Calder*. See *ante*, at 526–530.[14] This excursion into post-Restoration English history is diverting, but the Court's statement that "the circumstances of petitioner's case parallel those of Fenwick's case 300 years earlier," *ante*, at 530, simply will not wash. The preamendment version of Article 38.07 is nothing like the two-witness rule on which Fenwick vainly relied.[15]

First, the preamendment version of Article 38.07, unlike a two-witness rule, did not apply indifferently to all who testify. Rather, it branded a particular class of witnesses—

---

[14] Tellingly, the Court offers no evidence that anyone at the time of the Framers considered witness corroboration requirements of the type involved here to fall within the scope of the *ex post facto* prohibition.

[15] When the Texas Legislature wants to enact a two-witness rule, it knows how to do so. See Tex. Code Crim. Proc. Ann., Art. 38.15 (Vernon Supp. 2000) ("No person can be convicted of treason except upon the testimony of at least two witnesses to the same overt act, or upon his own confession in open court."); Art. 38.18(a) ("No person may be convicted of perjury or aggravated perjury if proof that his statement is false rests solely upon the testimony of one witness other than the defendant.").

sexual assault victims aged 14 or older—as less competent than others to speak in court. Second, as I have already. described, the Texas statute did not restrict the State to one prescribed form of proof. Both before and after the 1993 amendment, introduction of the victim's corroborated testimony was neither required nor necessarily sufficient to sustain a conviction. Prosecutors' compliance with both the old and new versions of Article 38.07 thus "says absolutely nothing about whether they have introduced a quantum of evidence sufficient to convict the offender." *Ante*, at 547, 551–552.[16] On the contrary, the only sufficiency rule applicable in Texas sexual offense prosecutions has always been a qualitative one: The State's evidence must be sufficient to prove every element of the offense beyond a reasonable doubt.

That should not be surprising. It makes little sense in our modern legal system to conceive of standards of proof in quantitative terms. In a civil case, the winner is the party that produces *better* evidence, not the party that produces *more* evidence. Similarly, in a criminal trial the prosecution need not introduce any fixed amount of evidence, so long as the evidence it does introduce could persuade a rational factfinder beyond a reasonable doubt. "Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of a controversy. In gauging the truth of conflicting evidence, a jury has no simple formulation of weights and measures on which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not

---

[16] *Noncompliance* with the former version of Article 38.07 does say something: The statute mandates acquittal if the prosecution comes forward with no evidence beyond the victim's testimony, which is deemed unreliable standing alone. But as the Court itself recognizes, "a witness competency rule that . . . has the practical effect of telling us what evidence would result in *acquittal* does not really speak to *Calder*'s fourth category." *Ante*, at 551.

quantity." *Weiler*, 323 U. S., at 608. If the Court wishes to rely on the fourth *Calder* category to render Texas' altered evidentiary rule prospective only, it should do so forthrightly by overruling *Hopt* and *Thompson* v. *Missouri*, rather than by attempting to portray Article 38.07 as a quantitative sufficiency rule indistinguishable from the two-witness requirement that figured in John Fenwick's case.

*     *     *

In sum, it is well settled (or was until today) that retroactive changes to rules concerning the admissibility of evidence and the competency of witnesses to testify cannot be *ex post facto*. Because Article 38.07 is in both function and purpose a rule of admissibility, *Thompson* v. *Missouri*, *Hopt*, *Beazell*, and *Collins* dictate that its retroactive application does not violate the *Ex Post Facto* Clause. That conclusion comports perfectly with the dual purposes that underlie the Clause: ensuring fair notice so that individuals can rely on the laws in force at the time they engage in conduct, and sustaining the separation of powers while preventing the passage of vindictive legislation. The Court today thus not only brings about an "undefined enlargement of the *Ex Post Facto* Clause," *Collins*, 497 U. S., at 46, that conflicts with established precedent, it also fails to advance the Clause's fundamental purposes. For these reasons, I dissent.